B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>West Valley Medical Partners , LLC, a California limited liability company | DEFENDANTS<br>STANLEY MENAKER an individual; MARINA MENAKER, an individual; and Does 1 through 10, inclusive |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>LANDSBERG LAW, APC<br>9300 Wilshire Boulevard, Suite 565,Beverly Hills, CA 90212<br>Telephone: (310) 409-2228 | ATTORNEYS (If Known) |

**PARTY** (Check One Box Only)
- ☐ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☒ Creditor
- ☐ Other
- ☐ Trustee

**PARTY** (Check One Box Only)
- ☒ Debtor
- ☐ U.S. Trustee/Bankruptcy Admin
- ☐ Creditor
- ☐ Other
- ☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

11 U.S.C. SECTION 523(a)(3). Plaintiff is an omitted creditor

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property – §542 turnover of property
- ☐ 12-Recovery of money/property – §547 preference
- ☐ 13-Recovery of money/property – §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability – §523(a)(5), domestic support
- ☐ 68-Dischargeability – §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability – §523(a)(8), student loan
- ☐ 64-Dischargeability – §523(a)(15), divorce or separation obligation (other than domestic support)
- ☒ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR<br>STANLEY MENAKER an individual, and MARINA MENAKER, an individual | | BANKRUPTCY CASE NO.<br>1:13-bk-13562-MB | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District Of California | | DIVISION OFFICE<br>San Fernando Valley | NAME OF JUDGE<br>Martin R. Barash |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | | |
| DATE    May 5, 2017 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Ian S. Landsberg , Esq. | |

### INSTRUCTIONS

     The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

     A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

     The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

1  Ian S. Landsberg (SBN 137431)
   **LANDSBERG LAW, APC**
2  9300 Wilshire Boulevard, Suite 565
   Beverly Hills, California 90212
3  Telephone:  (310) 409-2228
   Facsimile:  (310) 409-2380
4  Email:      ian@landsberg-law.com

5  Attorneys for Plaintiffs West Valley Medical Partners, LLC

6

7              **UNITED STATES BANKRUPTCY COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9              **SAN FERNANDO VALLEY DIVISION**

10

11  In re                                    | Case No. 1:13-bk-13562-MB

12  STANLEY MENAKER an individual, and
    MARINA MENAKER, an individual,           | Chapter 13

13
                                             | Adv. No. _____
14           Debtors.

15  _____          | **COMPLAINT TO DETERMINE
                                             | DISCHARGEABILITY OF DEBT
16  West Valley Medical Partners , LLC, a    | PURSUANT TO 11 U.S.C. SECTION
    California limited liability company,    | 523(a)(3)**

17           Plaintiff,

18      v.

19  STANLEY MENAKER an individual;
    MARINA MENAKER, an individual; and Does
20  1 through 10, inclusive,

21           Defendants.

22

23       Plaintiff and Creditor West Valley Medical Partners, LLC, a California limited liability

24  company ("Plaintiff") files this Complaint to Determine the Dischargeability of Debt Pursuant

25  to 11 U.S.C. §523(a)(3) against the Debtors and Defendants, Stanley Menaker and Marina

26  Menaker (collectively "Defendants" or "Debtors"), and alleges as follows:

27

28
                                    1

                              **COMPLAINT**

**THE PARTIES**

1.     Plaintiff West Valley Medical Partners, LLC is, and at all times relevant was, a California limited liability company formed in California, qualified and lawfully doing business in the State of California and owner of the premises located at 5363 Balboa Boulevard, Encino, California 91316.

2.     Defendant Stanley Menaker is, and at all times relevant was, an individual and, upon information and belief, a resident of Los Angeles County, California.

3.     Defendant Marina Menaker is, and at all times relevant was, an individual and, upon information and belief, a resident of Los Angeles County, California.

**JURISDICTION AND VENUE**

4.     This is an adversary proceeding brought pursuant to 11 U.S.C. §§523(a)(3) and Rule 7001 of the Federal Rules of Bankruptcy Procedure seeking a determination of the Court that certain obligations of the Debtors to the Plaintiff are nondischargeable.

5.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and 11 U.S.C. § 523 because this is a core proceeding to determine the nondischargeability of a particular debt of Defendants.

6.     Venue is proper in the Central District of California under 28 U.S.C. § 1408 and/or 28 U.S.C. § 1409. The San Fernando Valley Division is proper because Defendants have filed their bankruptcy petition therein.

**BACKGROUND INFORMATION**

7.     This Complaint concerns the nondischargeability of a debt neither listed nor scheduled under section 521(a)(1) of the Federal Rules of Bankruptcy. Defendants skipped out on their commercial lease in May 2013, which was to expire in September 2016, leaving significant amounts due and owing to Plaintiff. Shortly thereafter, Debtors' filed their Chapter 13 petition on May 24, 2013 without providing any notice to Plaintiff of their bankruptcy filing or of the October 8, 2013 deadline for the filing of claims. Debtors did not schedule the debt to Plaintiff, which deprived Plaintiff of the ability to participate in Debtors chapter 13 by filing a claim and/or

2

**COMPLAINT**

1    objecting to Debtors' chapter 13 plan.  Plaintiff did not receive notice of the bankruptcy filing

2    until 2015 - long after the deadline for filing a proof of claim expired on October 8, 2013 and long

3    after the confirmation of Debtors' Chapter 13 plan on December 16, 2013.  Debtors' Chapter 13

4    plan was confirmed on December 16, 2013.

5        8.    Without notice or knowledge of Debtors' bankruptcy, Plaintiff initiated a state court

6    action for breach of lease against Debtors in December 2014, after finding a replacement tenant

7    for the premises.  Debtors did not respond to the action and their default was entered on January

8    21, 2015.  In April 2015, after Debtors' default was entered and before the state court hearing on

9    Plaintiffs' request for entry of default judgment, Debtors finally notified Plaintiff of their

10   bankruptcy filing.  Debtors received a discharge in January 2017.

11       9.    As a result of Debtors' failure to list Plaintiff as a creditor or give timely notice to

12   Plaintiff of their bankruptcy, Plaintiff is an omitted creditor under Section 523(a)(3).

13       10.   On March 27, 2017 Plaintiff filed a Motion to Reopen Bankruptcy for Limited

14   Purpose of Obtaining a Determination of Nondischargeability of Debt Under U.S.C. §523(a)(3).

15   The court granted the Motion on April 6, 2017 and the Debtors' Chapter 13 Bankruptcy  case was

16   ordered reopened for the limited purpose of obtaining a determination of nondischargeability of

17   debt under U.S.C. §523(a)(3). Plaintiff was granted 30 days from the date of entry of the order to

18   seek relief by filing a complaint, as required by Rule 7001(6) of the Federal Rules of Bankruptcy

19   Procedure, regarding nondischargeability of debt against Debtors. This Complaint is timely.

20                    **GENERAL ALLEGATIONS**

21       11.   Plaintiff incorporates herein paragraphs 1 through 10, inclusive, of this Complaint, as

22   if set forth in full.

23       12.   Plaintiff leased commercial office space located in Encino, California to Debtors in or

24   about October 2009 pursuant to a written lease ("Lease").  The Lease was for a seven year term,

25   commencing October 1, 2009 through September 30, 2016.  A copy of the Lease and the First

26   Amendment to the Lease are attached hereto as Exhibit "A" and Exhibit "B" and incorporated

27   herein by this reference.

28

3

**COMPLAINT**

13.     Debtors vacated the premises in or about May 2013, prior to the expiration of the Lease term. Plaintiff later re-let the space to a new tenant.  As of December 2014, there was monies due and owing to Plaintiff under the Lease in an amount not less than $371,683.59.

14.     Without notice to Plaintiff, their landlord, Debtors filed their Chapter 13 petition on May 24, 2013.

15.     Debtors did not list Plaintiff as a creditor, nor did they provide Plaintiff with notice of the first meeting of creditors.

16.     The date set as the deadline for filing proofs of claims was October 8, 2013.

17.     Debtors' plan was confirmed on December 16, 2013.

18.     On January 1, 2013, the Chapter 13 Trustee filed its Notice of Intent to Pay Claims.

19.     On or about December 3, 2014, Plaintiff, without notice or knowledge of Debtor's bankruptcy action, filed a complaint for breach of commercial lease against Debtors in the Superior Court for the County of Los Angeles in a case entitled *West Valley Medical Partners, LLC v. Stanley Menaker, an individual, and Marina Menaker, an individual, Lucy Oks[1], an individual, and DOES 1-10*, Case No. BC 5656694 (the "State Court Action").

20.     Debtors neither responded to the State Court Action nor notified Plaintiff or the State Court of their bankruptcy filing.  On January 21, 2015, Plaintiffs filed with the State Court and served upon the Debtors a request for entry of default.  The State Court entered Debtors' default on January 21, 2015.

21.     On January 26, 2015, obviously after they received Plaintiffs' request for entry of default, Debtors amended their Schedule F to add Plaintiff as an unsecured creditor in the amount of $47,000.  However, this amendment was never served on Plaintiff, did not provide notice to Plaintiff, nor did Debtors seek to amend their chapter 13 plan to include Plaintiff in any chapter 13 plan distributions.

22.     On April 13, 2015, Plaintiff filed its default prove up application with the State Court.

---

[1] State Court defendant Lucy Oks has not filed for bankruptcy protection.

4

23.     On or about April 15, 2015, Debtors were served with a "Notice of Stay of Proceedings," which attached a "Notice of Bankruptcy Case Filing" regarding the Debtors' Chapter 13 petition.

24.     The April 15, 2015 Notice of Stay of Proceedings was the first written notification from Debtors that they had filed for bankruptcy protection.  The hearing date for Plaintiffs' default prove up in the State Court was set for April 30, 2015.

25.     On April 16, 2015, after receipt of the Notice of Stay of Proceedings, Plaintiffs filed a "Notice of Suggestion of Bankruptcy of Defendants Stanley Menaker and Marina Menaker" in the State Court.

26.     Judge Ruth Ann Kwan is the judge presiding in Department 72 of the California Superior Court before whom the State Court Action remains pending.  Since the April 30, 2015 default judgment prove up hearing, the State Court has continued the status conference on the entry of default judgement against Debtors several times.  Debtors received a discharge on January 17, 2017.

27.     At the last status conference on December 16, 2016, Judge Kwan advised Plaintiff that the State Court required a ruling from the Bankruptcy Court as to the whether the debt to Plaintiff has been discharged in order to proceed with the entry of judgment against Debtors.

**CAUSE OF ACTION**

**[Claim for Nondischargeability Pursuant to 11 U.S.C. §523(a)(3)]**

28.     Plaintiff refers to and incorporates herein by reference all the allegations contained in paragraphs 1 through 27, inclusive, as though set forth fully herein.

29.     Section 523(a)(3)(A) excepts from discharge unscheduled debts that are not of the type described in Sections 523(a)(2), (a)(4) or (a)(6), where the creditor had no notice or actual knowledge of the case in time to file a timely proof of claim.  Here, the money owed by Debtors under the Lease is not of the type described in Sections 523(a)(2), (4) or (6) nor did Plaintiff receive notice of the case to file a timely proof of claim.

5

**COMPLAINT**

30.     Under the plain language of 523(a)(3)(A), Plaintiff's claim, as an omitted creditor, was not discharged as a matter of law.

31.     The damages and claim resulting from the acts alleged above are nondischargeable as a matter of law.

32.     Plaintiff requests that this Court enter judgment against Defendants denying discharge of their debt to Plaintiff pursuant to 11 U.S.C. §523(a)(3), authorizing Plaintiff to proceed with its pending action in state court and grant any other such further relief as this Court deems just and proper

**WHEREFORE**, Plaintiff prays that the Court enter a judgment against Defendant as follows:

1.  For an order determining that Plaintiff's claims against Defendants are non-dischargeable pursuant to 11 U.S.C. § 523 (a)(3);

2.  For an order determining that Plaintiff's claims against Defendants are non-dischargeable in the amount of at least $371,683.59;

3.  Any additional sum as yet unknown, but according to proof;

4.  For attorneys' fees incurred herein;

5.  For costs of suit incurred herein; and

6.  For such other and further relief as the Court may deem just and proper.


Date:  May 5, 2017                          **LANDSBERG LAW, APC**



By: _____
    Ian S. Landsberg
    Attorneys for Plaintiff

**COMPLAINT**

EXHIBIT "A"

## LEASE

THIS LEASE ("**Lease**"), dated for reference purposes only as of October 22, 2009 is made by and between **West Valley Medical Partners, LLC** ("**Landlord**") and **Stanley Menaker, an individual and Marina Menaker, an individual, husband and wife and Lucy Oks, an individual, jointly and severally** (collectively referred to as "**Tenant**"), upon the following terms and conditions:

1.    **Premises and Basic Lease Information**

    1.1.    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, upon the terms and conditions set forth in this Lease, the Premises (defined in Section 1.1.1), as well as the right to use, in common with others, the Common Areas (defined in Section 1.2). The Premises are situated in that certain office building located at **5363 Balboa Blvd. Encino, California 91316** ("**Building**"). The Building, together with the buildings located at 5353 and 5359 Balboa Blvd., Encino, California 91316 and the land upon which the buildings are located and the Common Area including the surface parking are hereinafter collectively referred to as the "**Project**." The terms and conditions of this Lease include, without limitation, the following:

    1.1.1 **Premises**:  The premises known as **Suite 121** consists of approximately **2,800** rentable square feet on the First (1st) floor of the Building and is diagrammed on <u>Exhibit "A"</u> ("**Premises**"). Landlord and Tenant have each had an opportunity to measure the Premises and have agreed upon the rentable square footage, which shall not be subject to later measurement, confirmation or adjustment.

    1.1.2    **Lease Term**:  The term of this Lease ("**Lease Term**" or "**Term**") shall be for **Seven (7) years**, commencing upon substantial completion of the tenant improvements estimated to be **October 1, 2009** ("**Commencement Date**") and expiring on **September 30, 2016** ("**Expiration Date**"), unless sooner terminated pursuant to this Lease.

    1.1.3  **Base Rent** (See Section 3):  The base rent ("**Base Rent**") for the Premises will be **$7,700.00** per month, subject to the annual adjustments and Section 4, respectively and Additional Rent set forth in Section 3.

    1.1.4  **Base Year: 2009** is the **"Base Year"**.

    1.1.5  **Tenant's Percentage Share:  2.67 %** (See Sections 4.1 and 33). "**Tenant's Percentage Share**" is calculated as a fraction, the numerator of which is the rentable square footage of the Premises and the denominator of which is **103,189**, the approximate rentable square feet for the Building.

    1.1.6  **Security Deposit** (See Section 5):  <u>**$7,700.00**</u> shall be Tenant's Security Deposit paid at execution of this Lease, subject to adjustment pursuant to Section 5 below.

    1.1.7  **Permitted Use** (See Section 6.1):  Tenant shall use the Premises for **Medical Office and Sleep Study** usage.

1.1.8 **Address For Notices** (See Section 25):

Tenant: **Stanley and Marina Menaker**
**Lucy Oks**
**Moonlight Sleep Lab**
**5363 Balboa Boulevard**
**Suite 121**
**Encino, CA 91316**
**Ph: (818) 385.0077**
**Fax: (818) 342.0063**

Landlord: **West Valley Medical Partners, LLC**
**5363 Balboa Boulevard, Suite 227**
**Encino, CA 91316**
**Attn: Gary Grabel**
**Ph: (818) 986-9174**
**Fax: (818) 986-1540**

1.1.9 **Exhibits:** The following exhibits, schedules and riders are attached hereto and by this reference made as part of this Lease as if set forth in full in the Lease.

1.1.10 **Exhibit "A"** - Diagram of Premises.

1.2 **Common Areas.** The term "**Common Area(s)**" as used in this Lease shall mean all areas and facilities in the Project, which are provided and designated from time to time by Landlord for the general use and convenience of Tenant and other tenants of the Project and their respective employees and invitees. Common Areas include, without limitation, the lobby areas, walkways, parking facilities, landscaped areas, sidewalks, corridors, washrooms (if not part of the Premises), stairways, elevators, walls, common telephone and electrical closets, loading docks, plazas, service areas, and all other areas of the Project intended for common use. Floors wholly occupied by Tenant or any other tenant shall not have any facilities which shall be used in common with other tenants, except for elevators, fire stairs, shafts, utility and service closets, and similar installations. Tenant, its employees and invitees shall have a nonexclusive right to use the Common Areas, subject to Landlord's rights and duties as hereinafter set forth. Without Tenant's consent and without liability to Tenant, so long as Tenant's access to the Premises or ability to conduct business therefrom is not materially impaired, Landlord shall have the right to do the following: (a) establish and enforce in a nondiscriminatory, consistently applied manner, reasonable rules and regulations concerning the maintenance, management, use and operation of the Common Areas; (b) temporarily close any Common Area for maintenance, alterations or improvements; and (c) change the size, use, shape or nature of the Common Area.

2



2. **Commencement Date; Early Entry; Holding Over**

2.1     The Term and Tenant's obligation to pay Rent shall commence on the
Commencement Date set forth in Section 1.1.2. Tenant hereby leases and accepts the
Premises in its "as is, where is" condition and as being in good sanitary order, condition and
repair.

2.2     If the Landlord, for any reason whatsoever, cannot deliver possession of the
Premises to the Tenant on or before the Commencement Date, this Lease shall not be void or
voidable, nor shall Landlord be liable to Tenant for any loss or damage resulting therefrom, nor
shall the Expiration Date be extended, but in that event all rent shall be abated during the period
between the Commencement Date and the date on which Landlord delivers possession of the
Premises to Tenant.

2.3     Tenant has no right to retain possession of the Premises or any part thereof
beyond the expiration or termination of this Lease. In the event that Tenant holds over beyond
the expiration or termination of this Lease, then the Base Rent shall be increased to 150% of
the Base Rent applicable immediately preceding the expiration or termination. Nothing
contained herein shall be construed as consent by Landlord to any holding over by Tenant.
Acceptance by Landlord of any Rent after the expiration or termination of the Lease shall not be
deemed to constitute Landlord's consent to such hold over by Tenant.

2.4     Tenant shall open its business to the public from the Premises within one (1)
month following the execution of this Lease, shall continuously during the entire term of this
Lease (i) conduct and carry-on Tenant's business in the Premises, (ii) keep the Premises open
to the public, and (iii) cause Tenant's business to be conducted therein during the business
hours of each and every business day as specified by Landlord from time to time for the
Building; provided, however, that this provision shall not apply if Tenant's business shall be
temporarily shut down as a result of vacation not to exceed thirty (30) days, strikes, lockouts or
causes beyond the reasonable control of Tenant (financial inability excepted). The business
hours designated by Landlord as of the commencement of the term shall be 10 AM to 4 PM at
least four days per week. In the event Tenant is not so operate its business as specified herein,
then Tenant shall be in default of its obligations under this Lease and, in addition to other
remedies available to Landlord, Tenant shall pay to Landlord, as additional rent, one-thirtieth
(1/30) of the monthly Base Rent for each day that Tenant does not so operate its business from
the Premises. Such payment shall be in addition to the monthly Base Rent and shall
compensate Landlord for damage to Landlord caused by the creation of vacant and non-
operating space in the Building. Landlord and Tenant agree that this represents a fair and
reasonable estimate of the damage Landlord will suffer by reason of its breach and its precise
calculation is difficult to ascertain at this time.

3. **Base Rent; Adjustments; General Rent Provisions.**

3.1     Tenant shall pay to Landlord as Base Rent for the Premises, without prior notice
or demand, the amount specified in Section 1.1.3, in advance, on or before the first day of each
and every calendar month during the Lease Term except Tenant shall be obligated to pay one
half (1/2) of Base Rent for month one (1) through and including month six (6) of the Lease
Term.

3

3.2    For any period during the Lease Term which is less than one (1) month, Base Rent, Additional Rent (defined in Section 4.1), and any other sums which are payable by Tenant under the Lease (all of which shall be deemed "**Rent**") shall be prorated based upon a thirty (30) day month. Rent under this Lease shall be paid to Landlord, without deduction, offset or abatement (except as otherwise may be specifically set forth in this Lease) at Landlord's address as specified in Section 1.1.8 above. Rent must be paid in lawful money of the United States of America. Landlord shall have the right to accept all payments of Rent, whether full or partial, and to negotiate checks in payment thereof without any waiver of its rights, irrespective of any conditions to the contrary sought to be imposed by Tenant. Rent paid by check shall not be deemed paid to Landlord until funds clear and the check is honored. All payments received by Landlord from Tenant shall be applied to the oldest payment obligation owed by Tenant to Landlord.

3.3    In addition to any increase in Additional Rent described in section 4 below, on the first day of the month following each twelve (12) month period after the Commencement Date ("Adjustment Date"), the Base Rent in effect immediately prior to the applicable Adjustment Date shall be increase by Three and one half Percent (3.5%).

## 4.    **Additional Rent**.

4.1    **Computation of Additional Rent.** As soon as practicable following the end of each calendar year, Landlord shall provide Tenant with a statement of the amount by which the Operating Costs (as defined in Section 4.2 below) and the Tax Costs (as defined in Section 4.3 below) for the prior calendar year **("Prior Calendar Year")** exceeded Operating Costs and Tax Costs for the Base Year (collectively referred to as "**Pass-Through Cost Amount**"). Within thirty (30) days following Tenant's receipt of notice of the Pass-Through Cost Amount, Tenant shall pay to Landlord, as Additional Rent (as defined below in this Section 4.1), Tenant's Percentage Share of the Pass-Through Cost Amount for the prior calendar year less any amount paid by Tenant pursuant to Section 4.6 below. Under no circumstances shall the provisions of this Section 4 cause the Base Rent to be reduced. Neither Landlord's failure to deliver, nor the late delivery of such statement or statements shall constitute a default by Landlord hereunder, nor a waiver of Landlord's right to receive any Additional Rent or to later collect Additional Rent due as herein provided. Tenant's obligation to pay Pass-Through Cost Amounts shall survive the expiration or sooner termination of the Lease. Where only a portion of a calendar year falls within the Term, Landlord shall reasonably prorate the Pass-Through Cost Amount for such calendar year. As used herein "**Additional Rent**" shall mean amounts which are due hereunder by reason of increases in Operating Costs and Tax Costs. If, during any calendar year including the Base Year, the Building is less than ninety-five percent (95%) occupied, then for the purpose of computing Additional Rent due hereunder, the variable components of the Operating Costs and Tax Costs actually incurred during such calendar years shall be increased to approximate the amounts which would have been payable if the Building had been ninety-five percent (95%) occupied. Landlord shall have the same rights with respect to non-payment of Additional Rent hereunder as it has with respect to non-payment of any other amounts due hereunder.

### 4.2    **Operating Costs.**

4.2.1. **Definition of Operating Costs.**    "**Operating Costs**" shall mean the sum of any and all costs, expenses and disbursements of every kind paid or incurred by Landlord in connection with the ownership, management, operation, maintenance, repair, replacement,

4



restoration or modification of the Project, calculated in accordance with the financial statements of Landlord, including, but not be limited to, salaries, wages, benefits and related costs for employees; management fees, either as charged to Landlord by outside management companies or not exceeding the amount typically charged by outside management companies if Landlord or Landlord's affiliate manages the Project; charges for utilities and services provided to all tenants, including but not limited to janitorial services, window cleaning, elevator services, HVAC services, security services (including any taxes thereon); the cost of insurance and deductibles; outside accounting fees; office supplies; building cleaning supplies and materials; garbage and waste collection; licenses, certificate, permit and inspection fees; costs incurred in connection with any government enactments that may affect the Operating Costs; a reasonable allowance for depreciation (or amortization) or rental charges with respect to machinery and equipment; ground lease payments, if any; costs of Required Alterations (defined in Section 4.2.3 below); costs of capital improvements or other costs that are intended as a labor-saving device or to effect other economies in the maintenance or operation of all or part of the Project (including reasonable interest on the unamortized costs), as determined by Landlord's accountants to conform with applicable tax laws ("Cost Saving Capital Improvements"); Amortized Capital Costs (as hereinafter defined).

4.2.2 **Exclusions from Operating Costs.** Operating Costs shall exclude: (i) costs of any special services rendered to individual tenants; (ii) leasing commissions and other leasing expenses; and (iii) costs of capital improvements or other costs that are not intended as a labor-saving device or to effect other economies in the maintenance or operation of all or part of the Project. If any tenant (including Tenant) is using extra services because of either non business-hours use, extraordinary business operations, or special equipment, Landlord may elect to directly charge that tenant for the extra use and exclude those charges from Operating Costs.

4.2.3. **Definition of Required Alterations. "Required Alterations"** are any changes, alterations or improvements to the Project (excluding those attributable exclusively to Tenant's specific use and occupancy of the Premises, which alterations shall be Tenant's sole responsibility), including, but not limited to, the installation or modification of electrical, mechanical, water sprinkler, or other energy or life safety systems or components, required by any rule, regulation or law which became enacted and effective after the Commencement Date. The capital costs relating to such Required Alterations, including all related financing costs, shall be amortized over the useful life of the Required Alterations, all as determined by Landlord's accountants.

4.2.4 **Amortized Capital Costs.** "Amortized Capital Costs" shall mean the costs of capital improvements, other than Cost Saving Capital Improvements or Required Alterations, amortized on a straight-line basis over the useful life of the improvements (as determined by Landlord's accountants). Landlord shall determine, in its reasonable discretion, whether any expenditure is for a capital improvement.

4.3    **Tax Costs.**

4.3.1    "**Tax Costs**" shall mean the sum of the following: any and all real property and personal property taxes, gross rental taxes, assessments (including, but not limited to, general and special assessments and possessory interests), charges, surcharges, license and other fees, levies, cost of improvement bonds and any and all other taxes (other than income, franchise, inheritance and estate or gift taxes of Landlord) on or relating to all or a portion of the Project, including any legal or equitable interest of Landlord therein, that may be imposed, levied, assessed or charged for any reason by any authority having the direct or indirect power

5

to tax including, but not limited to, the United States or the state, county or city in which the Project is located, or any other local governmental authority, agency, district or political subdivision thereof, together with personal property taxes, assessments, fees and charges (other than those paid by Tenant pursuant to Section 26 below) and fees of tax consultants and attorneys retained to seek a reduction, to contest or to act in some other manner in connection with any of the foregoing Tax Costs, together with any tax, assessment or other amounts (including, without limitation, commercial rental and ground rental taxes) imposed, levied or charged as a substitute for or a supplement to the foregoing. Tax Costs shall include increases caused by increases in tax rates as well as increases caused by additional or increased assessed values for any reason including transfers of title to the Building or the Project.

4.5  **Landlord's Books and Records.** If Tenant disputes the amount of Additional Rent stated in the Reconciliation, Tenant may designate, within thirty (30) days after receipt of that Reconciliation, an independent certified public accountant to inspect Landlord's records. Tenant is not entitled to request that inspection, however, if Tenant makes the request more than thirty (30) days after receipt of the Reconciliation or is then in default under this Lease. Tenant must give reasonable notice to Landlord of the request for inspection, and the inspection must be conducted in Landlord's offices at a reasonable time or times. If, after that inspection, Tenant still disputes the Additional Rent, a certification of the proper amount shall be made, at Tenant's expense, by Landlord's independent certified public accountant. That certification shall be final and conclusive.

4.6  **Estimated Costs**. On or before April 1st of each Year during the Term of this Lease, Landlord shall use its best efforts to estimate the Pass-Through Cost Amount. Tenant shall pay one-twelfth (1/12th) of the estimated Pass-Through Cost Amount as Additional Rent for each of the succeeding twelve (12) months or in equal monthly installments over the remainder of the Lease Term (without regard to any extension thereof) if less than twelve (12) months. If at any time during the Year Landlord reasonably believes that the actual Pass-Through Cost Amount will vary from such estimated Pass-Through Cost Amount by more than five percent (5%), Landlord may by written notice to Tenant revise the estimate for the Year, and Additional Rent for the balance of such Year shall be paid based upon such revised estimates.

5.  **Security Deposit**. Concurrently with Tenant's execution of the Lease hereof, Tenant shall pay to Landlord a security deposit in the amount specified in Section 1.1.6 to secure the performance and observance of all obligations and covenants hereunder. Landlord may apply such deposit to remedy any failure by Tenant to perform or observe any of its material obligations and covenants hereunder. If Landlord applies all or any portion of such security deposit pursuant to the foregoing, Tenant shall within three (3) days following receipt of notice thereof replenish such security deposit in full. Provided that Tenant complies with and performs all of its obligations under this Lease, Landlord shall promptly return any unapplied portion of such security deposit to Tenant not later than sixty (60) days after the expiration or sooner termination of this Lease. Landlord shall not be required to keep such security deposit separate from its general funds and Tenant shall not be entitled to any interest on such security deposit.

6.  **Restrictions on Use; Compliance with Laws**.

6.1  Tenant shall use and occupy the Premises only for the specific uses specified in Section 1.1.7 above and for no other uses whatsoever. Whenever there is a reference to "medical" in this Lease, it shall include "dental" where the Tenant is engaged in the practice of dentistry. The reference to "medical" will also include the practice of Chiropractic and Non-

6

surgical Spinal Decompression and anything allowed under the license of Chiropractic within the laws of California. Tenant shall use and occupy the Premises in accordance with the Rules and Regulations (as defined in Section 36). In addition to complying with the Rules and Regulations, Tenant shall not (a) use the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs or injures occupants of or causes damage or to neighboring premises or properties, (b) conduct business or other activity in or about the Premises that places an unreasonable or excessive burden upon the public and Common Areas or the utility systems of the Project; (c) use the Premises for any purpose which, in Landlord's sole and absolute discretion, will permit any infectious disease to spread or will impair the value of the Building, (d) permit abortions to be performed in the Premises, (e) use the Premises for any research requiring animals, (f) operate a clinic specializing primarily in the diagnosis and treatment of Acquired Immune Deficiency Syndrome (AIDS), or (g) store specimen or waste products in the corridors or other Common Areas of the Building (Tenant shall store such items, whether for pickup, delivery or disposal, in such areas designated by Landlord) (h) use the Premises as a retail pharmacy or for the sale of medical equipment, (i) use the Premises for MRI or radiological diagnosis except for its own patients in connection with medical treatment, or (j) use the Premises as a restaurant or café or in general the service of any food or beverage.

6.2     Tenant shall not install or continue to use any equipment, apparatus or device in the Premises, which causes vibrations or excessive noise as reasonably determined by Landlord. Tenant shall not place a load upon any floor that may impair or damage the structural integrity of the Building as reasonably determined by Landlord.

6.3     Tenant shall, at its sole cost and expense, promptly comply with all applicable laws, statutes, ordinances and governmental rules, regulations and requirements now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar body now or hereafter constituted relating to or affecting the use or occupancy of the Premises. Tenant shall not knowingly do or permit anything to be done in or about the Premises or bring or keep anything therein which will in any way increase the rate of any insurance upon the Building or any of its contents, or cause cancellation of said insurance or otherwise affect said insurance in any manner. Tenant shall be responsible for any increase in cost of Landlord's insurance caused by or resulting from Tenant's breach of the obligations contained herein. If the Tenant is a member of any profession, he agrees to abide by the Code of Ethics of any association recognized as representing that particular profession in the County and State in which the Project is located. Tenant will hold Landlord harmless from any claim for damages arising from the sale or distribution of intoxicating narcotics on or about the Premises, or from any penalty or damage or charge imposed for any violation of any law or ordinance on the part of Tenant, and from any loss, cost, damage, or expense arising out of any failure of Tenant, in any respect, to comply with the requirements and provisions of this Lease binding upon said Tenant.

6.4     **Use of Hazardous Material.** Tenant shall not cause or permit any Hazardous Material (as defined in Section 6.4.4), to be generated, brought onto, used, stored, or disposed of in or about the Premises or the Project by Tenant or its agents, employees, contractors, subtenants, or invitees, except for limited quantities of standard office and janitorial supplies containing chemicals categorized as Hazardous Material and Medical Waste (as defined in Section 6.4.5) associated with Tenant's Permitted Use. Tenant shall use, store, and dispose of all such Hazardous Material in strict compliance with all applicable statutes, ordinances, regulations and orders in effect during the Lease Term that relate to public health and safety

and protection of the environment ("**Environmental Laws**"), including those Environmental Laws identified in Section 6.4.4.

6.4.1 **Notice of Release or Investigation.** If, during the Lease Term (including any extensions), Tenant becomes aware of (a) any actual or threatened release of any Hazardous Material on, under, or about the Premises or the Project, or (b) any inquiry, investigation, proceeding, or claim by any government agency or other person regarding the presence of Hazardous Material on, under, or about the Premises or the Project, Tenant shall give Landlord written notice of the release or investigation within five (5) days after learning of it and shall simultaneously furnish to Landlord copies of any claims, notices of violation, reports, or other writings received by Tenant that concern the release or investigation.

6.4.2 **Indemnification.** Tenant shall, at Tenant's sole expense and with counsel reasonably acceptable to Landlord, indemnify, defend, and hold harmless Landlord and Landlord's shareholders, directors, officers, employees, partners, affiliates, and agents with respect to all losses, claims, costs, damages, expenses, liabilities, liens, actions, causes of action, charges, assessments, fines and penalties arising out of or resulting from the release of any Hazardous Material in or about the Premises or the Project, or the violation of any Environmental Law, by Tenant or Tenant's agents, contractors, or invitees. This indemnification includes, but is not limited to losses attributable to diminution in the value of the Premises or the Project; loss or restriction of use of rentable space in the Building; adverse effect on the marketing of any space in the Building. This indemnification shall survive the expiration or termination of this Lease.

6.4.3 **Remediation Obligations.** If the presence of any Hazardous Material brought onto the Premises or the Project by Tenant or Tenant's employees, agents, contractors, or invitees results in contamination of the Building, Tenant shall promptly take all necessary actions, at Tenant's sole expense, to return the Premises or the Building to the condition that existed before the introduction of such Hazardous Material. Tenant shall first obtain Landlord's approval of the proposed remedial action. This provision does not limit the indemnification obligation set forth in Section 6.4.2 or elsewhere in this Lease.

6.4.4 **Definition of "Hazardous Material."** As used in this Lease, the term "**Hazardous Material**" shall mean any hazardous or toxic substance, material, or waste that is or becomes regulated by the United States, the State of California, or any local government authority having jurisdiction over the Building. Hazardous Material includes: any "hazardous substance," as that term is defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 United States Code sections 9601-9675); "hazardous waste," as that term is defined in the Resource Conservation and Recovery Act of 1976 (RCRA) (42 United States Code sections 6901-6992k); any pollutant, contaminant, or hazardous, dangerous, or toxic chemical, material, or substance, within the meaning of any other applicable federal, state, or local law, regulation, ordinance, or requirement (including consent decrees and administrative orders imposing liability or standards of conduct concerning any hazardous, dangerous, or toxic waste, substance, or material, now or hereafter in effect); petroleum products; radioactive material, including any source, special nuclear, or byproduct material as defined in 42 United States Code sections 2011-2297g–4; asbestos in any form or condition; infectious materials as used in the medical profession and as described in California Administrative Code Section 66840 *et seq*; and polychlorinated biphenyls (PCBs) and substances or compounds containing PCBs.

6.4.5 **Medical Waste.** If Tenant generates medical, dental and any other waste considered to be or containing Hazardous Material ("**Medical Waste**"), Tenant shall procure and maintain contracts for the daily collection of Medical Waste, which contracts shall be with contractors experienced and specializing in and duly and properly licensed for performing such services. Landlord shall have the right to approve of such contractors and the form and substance of such contracts. Tenant shall, upon Landlord's request, provide copies of such contracts to Landlord. Tenant shall place all Medical Waste only in specially marked receptacles therefore, and under no circumstances shall Medical Waste be placed in any other receptacles. Tenant shall comply with Environmental Laws applicable to the use, generation, storage, existence or disposal of Medical Waste.

7. **Improvements and Alterations.**

7.1 **Alterations, Additions or Improvements.** Without the prior written consent of Landlord, Tenant shall not make nor cause alterations, additions, or improvements in, on or to any part of the Premises or the Project, except to install freestanding furniture and floor coverings, where such freestanding furniture does not place a load on the floor that exceeds pounds per square foot as reasonably determined by Landlord from time to time. Any alterations, additions or improvements to the Premises desired by Tenant shall be made in accordance with plans and specifications approved in writing by Landlord and pursuant to the requirements of applicable governmental laws, regulations and permits. Landlord's approval of Tenant's plans and specifications shall not constitute Landlord's representation or warranty as to the adequacy of the plans and specifications or their compliance with applicable laws.

7.2 **Contractors for Improvements.** Any alterations, additions or improvements to the Premises made by Tenant shall be made by contractors selected by Tenant and reasonably approved by Landlord.

7.3 **Landlord's Consent to Improvements.** Landlord may impose as a condition to its consent to alterations, additions or improvements to the Premises desired by Tenant such requirements as Landlord may reasonably deem necessary including, without limitation, (i) requirements relating to the manner in which the work is done and the times during which the work is to be accomplished, (ii) an additional security deposit to cover the potential damage caused by removing such improvements at the expiration or sooner termination of the Lease, or (iii) a surety bond, a letter of credit, or other financial assurance that the cost of the alterations, additions or improvements will be paid when due. Any alterations, additions or improvements to the Premises and all trade fixtures and other items affixed in any manner to the Premises shall, unless Landlord elects otherwise, immediately upon installation become the property of Landlord, and shall remain upon, and be surrendered with the Premises, at the end of the Term, except Landlord may by written notice to Tenant, given no more than thirty (30) days after the end of the Term, require Tenant, at Tenant's expense, to remove any such items installed by Tenant. If Tenant desires to retain title to any such trade fixture or other items affixed to the Premises and remove them from the Premises upon termination of this Lease, Tenant shall obtain written agreement from Landlord to such retention and removal prior to affixing such items to the Premises. Upon such removal, Tenant shall repair at its sole cost and expense any damage caused to the Premises by such removal.

7.4 **Changes to Structure or Mechanical or Electrical Systems.** Notwithstanding any provision herein that permits Tenant to make its own alterations, additions or improvements to the Premises, Tenant shall not make any alterations, additions or improvements to the Premises which would negatively affect or require any alterations or modifications of the

Building's structure or its mechanical or electrical systems, or which would materially interfere with or disrupt other tenants in the Building or any work then being carried out therein by Landlord or its contractors.

7.5    **Telecommunications**.    Tenant shall pay the actual charge for telecommunications services provided to the Premises, including, but not limited to, the cost of installing any necessary additional telephone or telecommunications riser capacity as reasonably determined by Landlord. In addition, Tenant shall pay for any intra-building telephone and network cabling installed to exclusively serve all or any portion of the Premises, whether or not fully contained within the Premises, including all distribution throughout the Premises. All contractors retained by Tenant to make repairs to any portion of the intra-building telephone network system servicing the Premises shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld. Landlord may enter into an agreement, or may have an agreement in place, that allows one firm to manage the installation and maintenance of all intra-building telephone and network cabling from the minimum point of entry ("**MPOE**") in the Building to the demarcation point ("**DP**") within the Premises. If such an agreement is in place, then Tenant shall utilize such firm for all cabling between the MPOE and DP.

7.6    **Standard for Improvements.**    Any alterations, additions or improvements to the Premises shall be manufactured and installed in a good, workmanlike, diligent, prompt and expeditious manner in compliance with all Building specifications, applicable laws and applicable Environmental Laws.

8.    **Repairs and Maintenance**. Tenant, at its sole cost and expense, shall keep the Premises (including all Tenant Improvements, alterations, improvements, equipment, fixtures, cabinetry, ceilings, flooring, interior walls and surfaces, windows, doors, plumbing, toilets, water dispensing equipment, water heaters, telecommunication and electrical systems solely serving the Premises) in good order, condition, maintenance and repair at all times during the Lease Term. Such obligations of Tenant to keep the Premises in good order, condition, maintenance and repair shall exist whether or not same is necessitated as a result of Tenant's use, any prior use, the elements or the age of the Premises, and shall include restorations and replacements, as necessary. Landlord shall, subject to reimbursement as an Operating Cost and other provisions of this Lease that may limit Landlord's obligations under this Section, keep in good condition and repair the foundations, exterior walls, structural condition of interior bearing walls, and exterior roof of the Building. Landlord may repair, at the expense of Tenant, all damage or injury to the Premises, Tenant Improvements or to the Building or to its fixtures, appurtenances or equipment, or to any of the areas used in connection with the operation of the Building, caused, in any way, by Tenant or Tenant's agents, servants, employees, contractors, visitors or licensees or by moving property of Tenant in or out of the Building, or by installation or removal of furniture or other property, or resulting from heating, ventilating or air conditioning units, fire, short circuits, overflow or leakage of water, steam, gas, sewage or odors, or by bursting or leaking of pipes or plumbing works, or gas, or from any other cause, due to the carelessness, negligence, or improper conduct of Tenant or Tenant's agents, servants, employees, contractors, visitors or licensees. Except as otherwise specifically provided in this Lease, there shall be no allowance to Tenant for a diminution of rental value, and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from the making of, or the failure to make any repairs, alterations, decorations, additions or improvements in or to any portion of the Building or any of the areas used in connection with the operation thereof



(including the Common Areas), or the Premises, or in or to fixtures, appurtenances or equipment, or by reason of the act or neglect of Tenant or any other tenant or occupant of the Building; and in no event shall Landlord be responsible for any consequential damages arising or alleged to have arisen from any of the foregoing matters. Tenant hereby waives all rights under the provisions of Sections §1932, 1933, 1941 and 1942 of the Civil Code of the State of California and all rights under any law in existence during the term of this Lease authorizing a tenant to make repairs at the expense of a landlord or to terminate a lease upon the complete or partial destruction of the Premises.

9.    **Liens**. Tenant shall not be the cause or object of any liens or allow such liens to exist, attach to, be placed on, or encumber Landlord's or Tenant's interest in the Premises, Building, or Project by operation of law or otherwise. Tenant shall not suffer or permit any lien of mechanics, material suppliers, or others to be placed against the Premises, Building, or Project with respect to work or services performed or claimed to have been performed for Tenant or materials furnished or claimed to have been furnished to Tenant or the Premises. Landlord has the right at all times to post and keep posted on the Premises any notice that it considers necessary for protection from such liens. At least fifteen (15) days before beginning construction of any alterations, additions, or improvements in, on or to any part of the Premises or the Project, Tenant shall give Landlord written notice of the expected commencement date of that construction to permit Landlord to post and record a notice of nonresponsibility. If any such lien attaches or Tenant receives notice of any such lien, Tenant shall cause the lien to be immediately released and removed of record. Despite any other provision of this Lease, if the lien is not released and removed within five (5) days after Landlord delivers notice of the lien to Tenant, Landlord may immediately take all action necessary to release and remove the lien, without any duty to investigate the validity of it. All expenses (including reasonable attorney fees) incurred by Landlord in connection with the lien shall be considered Rent under this Lease and be immediately due and payable by Tenant.

10.    **Assignment and Subletting**.

    10.1    Tenant shall not have the right to assign the Lease, or sublease all or any portion of the Premises without Landlord's consent, which consent shall not be unreasonably withheld or delayed. If Landlord consents to an assignment or sublease, such assignment or sublease shall be subject to all the terms and conditions of the Lease, and on Landlord-approved forms. Any assignment, sublease or other transfer without Landlord's prior written consent shall be void.

    10.2    In determining whether to consent to an assignment or a sublease, Landlord may consider the nature of the proposed use and business and the financial stature of the proposed transferee. In addition, Landlord reserves the right to condition any such consent upon its reasonable determination that the proposed assignee's or subtenant's use of the Premises is permitted under this Lease, will not adversely materially impact on the Common Areas or utility systems of the Building, and will not be in competition with existing tenants uses in the Project.

    10.3    Tenant shall not enter into any proposed assignment, sublease or other transfer of any interest herein or in the Premises which would (a) detract from the first-class character or image of the Building, or (b) cause a breach by Landlord of any present or future loan obligation, agreement, covenants, conditions, restrictions, lease obligations or insurance policy

    10.4    Tenant shall give Landlord thirty (30) days prior written notice of its intention to assign, sublease or otherwise transfer its Lease. Tenant shall submit the following information

11

on Landlord-approved forms with such notice and with a written request for Landlord's consent to any assignment, sublease or transfer: (a) all transfer and related documents, (b) financial statements or other financial information, certified as true by Tenant, sufficient to enable Landlord to make an informed judgment as to the financial capabilities of the proposed transferee, and (c) such other information related to the proposed transfer and the parties involved therein as Landlord reasonably requests in writing.

10.5    If Landlord does not consent to the proposed sublease or assignment, or other transfer, Tenant shall not complete such proposed assignment or sublease. If Landlord consents to such proposed sublease or assignment, or other transfer, Tenant shall be required to pay Landlord's reasonable legal fees, not to exceed $1,000 for each assignment or sublease in addition to the administrative review fee. In addition, if Landlord consents to the proposed sublease, each subtenant shall agree that if Landlord gives such subtenant notice that Tenant is in default under this Lease, such subtenant shall thereafter make all sublease or other payments directly to Landlord, which sublease payments will be received by Landlord without any liability to honor the sublease (except to credit such payments against sums due under the Lease) and any subtenant shall agree to attorn to Landlord or its successors and assigns should the Lease be terminated for any reason, voluntarily, or otherwise, except that in no event shall Landlord or its successors or assigns be obligated to accept such attornment.

10.6    The parties acknowledge that Landlord's economic stake in the Project is significantly greater than Tenant's economic stake in this Lease. Accordingly, the parties have expressly bargained for the following allocation of any consideration to be derived by Tenant from any assignment, subletting or other transfer of this Lease. Tenant shall be required to pay Landlord fifty percent (50%) of any rent, key money, transfer consideration, or other premiums of any kind or nature on the sublease, assignment or transfer in excess of the Base Rent payable by Tenant under this Lease on a per rentable square foot basis net of Tenant's third-party costs incurred to facilitate the transfer (the "**Transfer Premium**"). Such payments shall be paid, in the same manner and at the same time as Tenant receives such Transfer Premium, whether such Transfer Premium is in the form of an increased rental, a lump sum payment or any other form of consideration. If such sublease, assignment or transfer pertains to a portion of the Premises only, any Transfer Premium shall be computed on the assumption that Tenant's Rent and other sums due hereunder are allocable on a pro rata per square foot basis. Tenant shall not artificially structure any sublease, assignment or other transfer of its business or other assets or take any other steps to circumvent or to reduce the amount payable to Landlord under this Section 10.6. The amount payable to Landlord under this Section 10.6 shall be the amount that would have been payable to Landlord had the Tenant not artificially structured the sublease, assignment or transfer of its business or other assets or otherwise tried to circumvent this Section 10.6.

10.7    The provisions of this Section 10 shall apply regardless of whether such assignment, sublease or other transfer is made in compliance with the provisions of this Lease. Any payments made to Landlord pursuant to this Section 10 shall not cure any default under this Lease arising from such assignment, sublease or transfer.

10.8    No assignment, sublease or other transfer shall release Tenant from any of its obligations hereunder. Landlord's consent to any one transfer shall apply only to the specific transaction thereby authorized and such consent shall not waive the duty of Tenant or any transferee to obtain Landlord's consent to any other or subsequent transfer, or modify or limit Landlord's rights hereunder in any way. Landlord's acceptance of Rent directly from any assignee, subtenant or other transferee shall not be construed as Landlord's consent thereto



nor Landlord's agreement to accept the attornment of any subtenant in the event of any termination of this Lease. In no event shall Landlord's enforcement of any provision of this Lease against transferee be deemed a waiver of Landlord's right to enforce any Lease provision against Tenant or any other person.

10.9   If Tenant is a corporation, an unincorporated association or a partnership (including, without limitation, a limited liability company ("**LLC**") or a limited liability partnership ("**LLP**")), any cumulative transfer, assignment or hypothecation of any stock or interest in such corporation, association or partnership greater than thirty percent (30%) thereof, or any cumulative transfer, assignment or hypothecation (other than in the ordinary course of business) of any asset of such corporation, association, partnership, LLC or LLP greater than thirty percent (30%) thereof ("**Change in Control**"), shall be deemed an assignment within the meaning and provisions of this Section 10. The foregoing shall not apply to corporations, where thirty percent (30%) or more of the stock is traded through a regional, national or over-the-counter exchange. Provided that the transferee's use is permitted under the Lease and provided that Tenant notifies Landlord of its intention at least thirty (30) days prior to such assignment or sublease, then notwithstanding anything in this Lease to the contrary, Tenant shall have the right, without obtaining Landlord's consent or paying any Transfer Premium, to do the following: (a) assign this Lease or sublet all or any part of the Premises to a parent, wholly-owned subsidiary or affiliate of Tenant; or (b) assign this Lease or sublet all or any part of the Premises to an entity into which Tenant is merged or by which it has been acquired.

10.10  Notwithstanding any of the foregoing provisions, covenants and conditions to the contrary, in the event that this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. 101 et seq. (the "**Bankruptcy Code**"), any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of the Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust by the bankruptcy trustee in possession or debtor in possession for the benefit of the Landlord and shall promptly be paid to or turned over to Landlord. If Tenant proposes to assign this Lease pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment setting forth (a) the name and address of such person, (b) all of the terms and conditions of such offer, (c) the adequate assurance provided by Tenant to assure such person's future performance under the Lease including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code, or any such successor or substitute legislation or rule thereto, shall be given to Landlord by Tenant no later than twenty (20) days after receipt of such bona fide offer by Tenant. Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption. Landlord shall thereupon have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less any brokerage commissions, attorneys' fees, tenant improvement costs or other charges which may be payable out of the consideration to be paid by such person for the assignment of this Lease. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such

13



assignee shall upon demand execute and deliver to Landlord an instrument confirming such assumption. Subject to this Section 10 and Section 22 below, the Lease provisions shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

11.    **Waiver; Indemnity.**

11.1 **Waiver.** To the fullest extent permitted by law, Tenant, on its behalf and on behalf of all Tenant Parties (hereafter defined), waives all claims (in law, equity, or otherwise) against Landlord Parties (hereafter defined) arising out of, knowingly and voluntarily assumes the risk of, and agrees that Landlord Parties shall not be liable to Tenant Parties for any of the following; (a) injury to or death of any person; or (b) loss of, injury or damage to, or destruction of any tangible or intangible property, including the resulting loss of use, economic losses, and consequential or resulting damage of any kind from any cause. This exculpation clause shall not apply to claims against Landlord Parties to the extent that a final judgment of a court of competent jurisdiction establishes that the injury, loss, damage, or destruction was proximately caused by Landlord Parties' fraud or willful injury to person or property. "**Tenant Parties**" refers singularly and collectively to Tenant and Tenant's officers, members, partners, agents, employees, and independent contractors as well as to all persons and entities claiming through any of these persons or entities. The term "**Landlord Parties**" refers singularly and collectively to Landlord and the partners, venturers, trustees, and ancillary trustees of Landlord and the respective officers, directors, shareholders, members, parents, subsidiaries, and any other affiliated entities, personal representatives, executors, heirs, assigns, licensees, invitees, beneficiaries, agents, servants, employees, and independent contractors of these persons or entities. The clauses of this section 11.1 shall survive the expiration or earlier termination of this Lease until all claims within the scope of this section 11.1 are fully, finally, and absolutely barred by the applicable statutes of limitations. With respect to the exculpation provided in this Section 11, Tenant waives the benefits of Civil Code section 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

11.2 **Tenant's Indemnification of Landlord Parties.** To the fullest extent permitted by law, Tenant shall, at Tenant's sole expense and with counsel reasonably acceptable to Landlord, indemnify, defend, and hold harmless Landlord Parties from and against all Claims (hereafter defined) from any cause, arising out of or relating (directly or indirectly) to this Lease, the tenancy created under this Lease, or the Premises, including: (a) the use or occupancy, or manner of use or occupancy, of the Premises or Project by Tenant Parties; (b) any act, error, omission, or negligence of Tenant Parties or of any invitee, guest, or licensee of Tenant in, on, or about the Project; (c) Tenant's conduct of its business; (d) any alterations, activities, work, or things done, omitted, permitted, allowed, or suffered by Tenant Parties in, at, or about the Premises or Project, including the violation of or failure to comply with any applicable laws, statutes, ordinances, standards, rules, regulations, orders, decrees, or judgments in existence on the Commencement Date or enacted, promulgated, or issued after the date of this Lease; and (f) any breach or default in performance of any obligation on Tenant's part to be performed under this Lease, whether before or during the Lease Term or after its expiration or earlier termination. For purposes of this Lease, "**Claims**" means any and all claims, losses, costs,

14



damage, expenses, liabilities, liens, actions, causes of action (whether in tort or contract, law or equity, or otherwise), charges, assessments, fines, and penalties of any kind (including consultant and expert expenses, court costs, and attorney fees actually incurred). Except as hereafter provided, the indemnification in Section 11.2 shall apply regardless of the active or passive negligence of Landlord Parties and regardless of whether liability without fault or strict liability is imposed or sought to be imposed on Landlord Parties. The indemnification in this Section 11.2 shall not apply to the extent that a final judgment of a court of competent jurisdiction establishes that a Claim against one Landlord Party was proximately caused by the fraud or willful misconduct of that Landlord Party. In that event, however, this indemnification shall remain valid for all other Landlord Parties. The provisions of this Section 11.2 shall survive the expiration or earlier termination of this Lease until all claims against Landlord Parties involving any of the indemnified matters are fully, finally, and absolutely barred by the applicable statutes of limitations.

12.    **Insurance.**

12.1    Throughout the Lease Term hereof, Tenant shall carry and maintain, at its own expense, the following types, amounts and forms of insurance:

12.1.1 **Commercial General Liability Insurance**. A policy of commercial general liability insurance with a combined single limit of Two Million Dollars ($2,000,000) per occurrence with Two Million Dollars ($2,000,000) aggregate coverage, in the name of Tenant (naming, as additional insureds, Landlord, its management company, and, if requested by Landlord, any mortgagee, trust deed holder, or secured party with an interest in this Project). Tenant's liability coverage shall include, without limitation, all coverage typically provided by the Broad Form Comprehensive General Liability Endorsement, including broad form property damage, and premises-operations coverage, products-completed operations coverage, owners and contractors protective coverage, and the broadest form of contractual liability coverage, the last of which shall cover the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements in Section 11 above. Such policy shall provide coverage on an occurrence basis. The amount of such insurance required hereunder shall be subject to adjustment from time to time as reasonably requested by Landlord, but Landlord shall not raise such coverage amounts to an extent where they materially exceed that customarily carried by prudent tenants in first class office buildings in the Project area.

12.1.2 **Tenant's Property Insurance**. Tenant shall procure and maintain property insurance coverage for: (a) all office furniture, trade fixtures, office equipment, merchandise and all other items of Tenant's property in, on or about the Premises and the Project, including property installed by, for or at the expense of Tenant and (b) Tenant Improvements. Tenant's property insurance shall be written on the broadest available "all risk" (special causes of loss) policy form and shall include an agreed amount endorsement for no less than one hundred percent (100%) of the full replacement cost (new, without deduction for depreciation) of the covered items and property. The property insurance coverage shall include vandalism and malicious mischief coverage, sprinkler leakage coverage and earthquake sprinkler leakage coverage. Landlord shall be named as an additional loss payee on such insurance policies.

12.1.3 **Tenant's Worker's Compensation and Employer Liability Insurance**. Tenant shall procure and maintain policies of worker's compensation insurance and employer liability insurance reasonably acceptable to Landlord.

12.1.4 **Business Interruption**. Business interruption and loss of income insurance in amounts sufficient to insure Tenant's business operations and rental loss for a

period of not less than one (1) year.

12.2    **Recovery for Tenant's Negligence**.  Although named as an additional insured and subject to the provisions of Section 12.7 of this Lease, Landlord shall be entitled to recover under said policies for any loss occasioned to it, its servants, agents and employees, by reason of the negligence, recklessness or willful misconduct of Tenant.

12.3    **Insurance Company; Delivery of Certificate, Policy and Endorsements**. Tenant's insurance policies required hereunder shall be issued by an insurance company with a rating of no less than A–VIII in the current Best's Insurance Guide, or that is otherwise acceptable to Landlord, and admitted to engage in the business of insurance in the State of California.  Prior to Tenant's occupancy of the Premises, Tenant shall provide Landlord with evidence of compliance with Tenant's insurance requirements under the Lease, including the endorsements specified in Section 12.1, and, as available, a certified copy of Tenant's liability policies and evidence of insurance on Accord Form 27 for all insurance policies regarding the Premises, executed by an authorized agent of the insurer or insurers.  Each insurance policy shall provide that it may not be modified or canceled without thirty (30) days prior written notice to Landlord (by any means described in Section 25 below) and to any other additional insureds. At least ten (10) days prior to the expiration of any of such policies, Tenant shall furnish Landlord with a renewal or binder therefore.

12.4    **Blanket Insurance**.  Tenant may carry insurance by a combination of primary, excess and umbrella policies, provided that the policies are absolutely concurrent in all respects regarding the coverage afforded by the policies.  The coverage of any excess or umbrella policy must be at least as broad as the coverage of the primary policy.  All insurance policies carried by Tenant for Tenant's Premises and personal property shall be primary and non-contributory with respect to any other insurance available to and purchased by Landlord.

12.5    **Tenant's Failure to Obtain Insurance**.  If Tenant fails to carry any insurance policy required hereunder or to furnish certificates pursuant hereto, Landlord may, upon no less than ten (10) business days prior written notice, and without waiving Tenant's default, obtain such insurance.  In such case, Tenant, with the next month's Rent due hereunder, shall reimburse Landlord for the cost thereof including interest at the Interest Rate specified in Section 27.

12.6    **Landlord's Insurance**.  During the Lease Term, Landlord shall procure and maintain property and liability insurance for the Project in such reasonable amounts, and with such reasonable coverage, as would be carried by a prudent owner of a similar building in the Project area, or as any lienholder may require.  Tenant acknowledges that it shall not be a named insured or an additional insured in such policies, and that it has no right to receive any proceeds from any such insurance policies carried by Landlord.  Landlord may but shall not be required to carry insurance coverage for damages caused by flood or earthquake.

12.7    **Waiver of Subrogation**.  Landlord and Tenant agree to cause the insurance companies issuing their respective property (first party) insurance to waive any subrogation rights that those companies may have against Tenant Parties or Landlord Parties, respectively, as long as the insurance is not invalidated by the waiver.  If the waivers of subrogation are contained in their respective insurance policies, Landlord and Tenant waive any right that either may have against the other on account of any loss or damage to their respective property to the extent that the loss or damage is insured under their respective insurance policies.

12.8    **Increases in Premiums due to Tenant's Use or Occupancy**.  If, after Landlord

provides notice to Tenant that the insurance carrier is proposing increased premiums to the Project due to Tenant's use or occupancy of the Premises, and Tenant fails to cease the offending use within ten (10) business days after receipt of such notice, Tenant shall pay said increases in insurance premiums.

13.    **Services and Utilities.**

13.1    Subject to Tenant's obligation to pay Tenant's Percentage Share of the Pass-Through Cost Amount as set forth in Section 4, Landlord shall provide the following services and utilities during the Lease Term, as stated below.

13.1.1 Subject to all governmental rules, regulations and guidelines applicable thereto, Landlord shall provide heating, ventilation and air conditioning ("**HVAC**") to the Premises in a manner consistent with a first class office building from Monday through Friday, from 8:00 a.m. to 8:00 p.m. and on Saturday from 8:00 a.m. to 2:00 p.m., except for the celebratory days of the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas (collectively "**Business Hours**").   Landlord shall impose a direct charge, including a fifteen percent (15%) administrative fee, and establish reasonable rules and regulations for heating and air conditioning and other services or utilities requested by Tenant at any time other than Business Hours.

13.1.2 Landlord shall also provide electrical lighting in all Common Areas, parking facilities or storage areas and replace building standard lamps and ballasts as required.

13.1.3 Landlord shall provide hot and cold water to the Building's rest rooms (and, as applicable, to any sink, refrigerator or dishwasher in the Premises).

13.1.4 Landlord shall provide passenger elevator service at all times; provided, however, after Business Hours, Landlord may decrease the availability of passenger elevator service so long as at least one car services the floor on which the Premises are located.

13.1.5 Landlord shall provide for the Premises and the Common Areas of the Project normal janitorial services five (5) days per week, similar to that furnished in comparable office buildings in the Project area and in accordance with the Building standard janitorial and cleaning service specifications.  Tenant shall be responsible for providing, at its sole cost and expense, all necessary janitorial supplies for the Premises.

13.1.6 Landlord shall provide access to the Building 24 hours a day, every day.

13.2    Wherever heat generating machines or equipment are used in the Premises which affect the temperature otherwise maintained by the air conditioning system, Landlord reserves the right to install supplementary air conditioning units and the cost thereof, including the cost of installation and the cost of operation and maintenance thereof, shall be paid by Tenant to Landlord upon demand by Landlord.  Tenant will not, without the prior written consent of Landlord, use any apparatus or device in the Premises other than equipment utilized in the normal practice of medicine or dentistry.  Tenant will connect any apparatus or device used in the Premises only to existing electrical outlets, water pipes or air pipes.  No electronic data processing machines or other machines using electrical current in excess of that normally provided in the Building may be used without the prior written consent of Landlord.  If Tenant shall require water or natural gas in excess of that usually furnished or supplied in connection with equipment used in the normal practice of medicine or dentistry, or electric current in excess of 1.5 kilowatt-hours per square foot of the Premises per month, Landlord may cause a water meter, gas meter, and electric current meter to be installed so as to measure the amount of water, natural gas, and electric current consumed for such use by Tenant.  The cost of any such

17

meters and of installation, maintenance and repair thereof, and a fifteen percent (15%) administrative fee for Landlord's monitoring of Tenant's over standard consumption of utilities, shall be paid for by Tenant, and Tenant agrees to pay Landlord promptly upon demand for all such excess water, natural gas and electric current consumed as shown by said meters at the rates (including demand rates) charged for such services by the city or the local public utility, as the case may be, furnishing the same, plus additional expense incurred in keeping account of the water, natural gas, and electric current so consumed. In lieu thereof, Landlord may obtain an engineer's estimate of the additional water, natural gas or current used and Tenant shall pay an additional amount based upon such estimate including the cost of such estimate.

13.3    Landlord shall not be in default or be liable for any damages directly or indirectly resulting from any interruption of utilities, services or access to the Premises, for any reason whatsoever, including those caused by: (a) the installation or repair of any equipment in connection with the furnishing of utilities or services; (b) acts of God or the elements, labor disturbances of any character, any other accidents or any other conditions, or due to repairs or improvements to the Premises or the Project; or (c) the limitation, curtailment, rationing or restriction imposed by any governmental agency or service or utility supplier on use of water or electricity, gas or any other form of energy or any other service or utility whatsoever serving the Premises or the Project. Furthermore, without any obligation or compensation to Tenant, Landlord shall be entitled to cooperate voluntarily in a reasonable manner with the efforts of national, state or local governmental agencies or service or utility suppliers in reducing energy or other resource consumption. If Landlord so cooperates, Tenant shall also reasonably cooperate therewith, provided it does not materially interfere with Tenant's use of the Premises.

14.    **Estoppel Certificate.** Within fifteen (15) days after any written request from Landlord, Tenant shall execute and deliver to Landlord a certificate ("**Estoppel Certificate**") stating: (a) that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications or attaching all amendments to the Lease), (b) the then current Base Rent and the date to which said Base Rent has been paid, (c) whether or not Landlord is then under default of this Lease and if so, the nature of such default and date notice of default was given Landlord, and (d) confirmation of any other requested information. Landlord and Tenant intend that any existing or prospective lender or any prospective purchaser or may rely on such Estoppel Certificate. Failure of Tenant to provide Landlord with said Estoppel Certificate as provided above shall be a default under the Lease.

15.    **Subordination; Requirements of Lenders.** This Lease is subject and subordinate to the lien of all (i) present and future mortgages, deeds of trust, or other encumbrances ("**encumbrances**") of the Project; (ii) all present and future ground or underlying leases ("**underlying leases**") of the Building and Project now or hereafter in force against the Building and Project; and (iii) all renewals, extensions, modifications, consolidations, and replacements of the items described in subsections (i)-(ii). Despite any other provision of this Section 15, any encumbrance holder or lessor may elect that this Lease shall be senior to and have priority over that encumbrance or underlying lease whether this Lease is dated before or after the date of the encumbrance or underlying lease. This subordination is self-operative, and no further instrument of subordination shall be required to make it effective. Although the subordination is self operative and requires no further instrument to make it operative, if Landlord requests confirmation of subordination, Tenant shall, within five (5) days after Landlord's request, execute any further instruments or assurances in recordable form that Landlord reasonably



considers necessary to evidence or confirm the subordination or superiority of this Lease to any such encumbrances or underlying leases. Tenant irrevocably appoints Landlord, as Tenant's agent to execute and deliver in the name of Tenant any such instrument(s) if Tenant fails to do so. This authorization shall in no way relieve Tenant of the obligation to execute such instrument(s) of subordination or superiority. Tenant's failure to execute and deliver such instrument(s) shall constitute a default under this Lease. Tenant covenants and agrees to attorn to the transferee of Landlord's interest in the Project by foreclosure, deed in lieu of foreclosure, exercise of any remedy provided in any encumbrance or underlying lease, or operation of law (without any deductions or setoffs), if requested to do so by the transferee, and to recognize the transferee as the lessor under this Lease. The transferee shall not be liable for any acts, omissions, or defaults of Landlord that occurred before the sale or conveyance; or the return of any security deposit except for deposits actually paid to the transferee. Tenant agrees to give written notice of any default by Landlord to the holder of any prior Encumbrance or Underlying Lease. Tenant agrees that, before it exercises any rights or remedies under the Lease, the lienholder or lessor shall have the right, but not the obligation, to cure the default within the same time, if any, given to Landlord to cure the default, plus an additional thirty (30) days. Tenant agrees that this cure period shall be extended by the time necessary for the lienholder to begin foreclosure proceedings and to obtain possession of the Building or Project, as applicable.

16.    **Access by Landlord.**

16.1    Landlord (and its agents, contractors and employees) reserves the right, without abatement of Rent, to enter the Premises at reasonable times and after reasonable advance notice (except in cases of emergency) to inspect it, to supply janitorial services and any other service to be provided by Landlord to Tenant hereunder, to show the Premises to any prospective purchaser, beneficiary, mortgagee, to post notices of non-responsibility, to make any alteration, improvement or repair to the Premises required by law or consented to by Tenant, or, during the last six (6) months of the Lease Term, to show it to prospective tenants. For the purpose of making any alterations, improvement or repair to the Premises or any portion of the Project, Landlord may erect, use and maintain scaffolding, pipes, conduits and other necessary structures in and through the Project and the Premises where reasonably required by the character of the work to be performed and in conformance with good construction practices, provided that entrance to the Premises shall not be blocked thereby, and provided further that Landlord works expeditiously and uses its best efforts to minimize any interference with Tenant's use of and access to the Premises. Tenant hereby waives any claim for damages or abatement of Rent for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby, except as otherwise set forth in the Lease or to the extent arising from the negligence, recklessness or willful misconduct of Landlord or Landlord's employees, agents, representatives, contractors, or invitees.

16.2    For each of the aforesaid purposes, Landlord shall at all times have and retain a key to all of the doors in, upon and about the Premises, excluding Tenant's vaults and safes, and Landlord shall have the right to use any and all means which Landlord may deem reasonably necessary or proper to open said doors in any emergency, and any such entry to the Premises or portions thereof by Landlord shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an eviction, actual or constructive, of Tenant from the Premises or any portion thereof. If at any time during the Lease Term Tenant wishes to re-key its Premises, all such re-keying shall be done by



Landlord with locks and hardware supplied by Landlord all at Tenant's sole cost and expense.

17. **Default by Tenant.**

17.1 The occurrence of any of the following shall constitute a default by Tenant under this Lease:

17.1.1 Tenant's failure to pay when due any Rent required to be paid under this Lease if the failure continues for three (3) days after written notice of the failure from Landlord to Tenant;

17.1.2 Tenant's failure to provide an estoppel certificate as required by Section 14 or any instrument or assurance as required by Section 15, if the failure continues for five (5) days after written notice of the failure from Landlord to Tenant;

17.1.3 Tenant's failure to perform any other obligation under this Lease if the failure continues for fifteen (15) days after written notice of the failure from Landlord to Tenant;

17.1.4 Tenant's abandonment of the Premises for fourteen (14) days or more;

17.1.5 To the extent permitted by law:

17.1.5.1 A general assignment by Tenant or any guarantor of the Lease for the benefit of creditors;

17.1.5.2 The filing by or against Tenant, or any guarantor, of any proceeding under an insolvency or bankruptcy law, unless (in the case of an involuntary proceeding) the proceeding is dismissed within sixty (60) days;

17.1.5.3 The appointment of a trustee or receiver to take possession of all or substantially all the assets of Tenant or any guarantor, unless possession is unconditionally restored to Tenant or that guarantor within thirty (30) days and the trusteeship or receivership is dissolved; or

17.1.5.4 Any execution or other judicially authorized seizure of all or substantially all the assets of Tenant located on the Premises, or of Tenant's interest in this Lease, unless that seizure is discharged within thirty (30) days; or

17.1.6 The committing of waste on the Premises;

17.2 Replacement of Statutory Notice Requirements. When this Lease requires service of a notice, that notice shall replace rather than supplement any equivalent or similar statutory notice, including any notices required by Code of Civil Procedure section 1161 or any similar or successor statute. When a statute requires service of a notice in a particular manner, service of that notice (or a similar notice required by this Lease) in the manner required by Section 25 shall replace and satisfy the statutory service–of–notice procedures, including those required by Code of Civil Procedure section 1162 or any similar or successor statute.

18. **Landlord's Remedies on Tenant's Default.**

18.1 On the occurrence of a default by Tenant, Landlord shall have the right to pursue any one or more of the following remedies in addition to any other remedies now or later available to Landlord at law or in equity. These remedies are not exclusive but cumulative.

18.1.1 Termination of Lease. Landlord may terminate this Lease and recover possession of the Premises. Once Landlord has terminated this Lease, Tenant shall

immediately surrender the Premises to Landlord.  On termination of this Lease, Landlord may recover from Tenant all of the following:

18.1.1.1  The worth at the time of the award of any unpaid Rent that had been earned at the time of the termination, to be computed by allowing interest at the rate set forth in Section 27 but in no case greater than the maximum amount of interest permitted by law;

18.1.1.2  The worth at the time of the award of the amount by which the unpaid Rent that would have been earned between the time of the termination and the time of the award exceeds the amount of unpaid Rent that Tenant proves could reasonably have been avoided, to be computed by allowing interest at the rate set forth in Section 27 but in no case greater than the maximum amount of interest permitted by law;

18.1.1.3  The worth at the time of the award of the amount by which the unpaid Rent for the balance of the Lease Term after the time of the award exceeds the amount of unpaid Rent that Tenant proves could reasonably have been avoided, to be computed by discounting that amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%);

18.1.1.4  Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform obligations under this Lease, including brokerage commissions and advertising expenses, expenses of remodeling the Premises for a new tenant (whether for the same or a different use), and any special concessions made to obtain a new tenant; and

18.1.1.5  Any other amounts, in addition to or in lieu of those listed above, that may be permitted by applicable law.

18.2   Continuation of Lease in Effect.  Landlord shall have the remedy described in Civil Code section 1951.4, which provides that, when a tenant has the right to sublet or assign (subject only to reasonable limitations), the landlord may continue the lease in effect after the tenant's breach and abandonment and recover Rent as it becomes due.  Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover all Rent as it becomes due.

18.3   Tenant's Subleases.  Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, Landlord may:

18.3.1  Terminate any sublease, license, concession, or other consensual arrangement for possession entered into by Tenant and affecting the Premises.

18.3.2  Choose to succeed to Tenant's interest in such an arrangement.  If Landlord elects to succeed to Tenant's interest in such an arrangement, Tenant shall, as of the date of notice by Landlord of that election, have no further right to, or interest in, the Rent or other consideration receivable under that arrangement.

18.4   Form of Payment After Default.  If Tenant fails to pay any amount due under this Lease within three (3) days after the due date or if Tenant draws a check on an account with insufficient funds, Landlord shall have the right to recover from Tenant any and all charges imposed by the financial institution as a result of the not sufficient funds check and to require that any subsequent amounts paid by Tenant to Landlord under this Lease (to cure a default or otherwise) be paid in the form of cash, money order, cashier's or certified check drawn on an institution acceptable to Landlord, or other form approved by Landlord despite any prior practice



of accepting payments in a different form.

18.5    Efforts To Relet.  For purposes of this Section 18, Tenant's right to possession shall not be considered to have been terminated by Landlord's efforts to relet the Premises, by Landlord's acts of maintenance or preservation with respect to the Premises, or by appointment of a receiver to protect Landlord's interests under this Lease.  This list is merely illustrative of acts that may be performed by Landlord without terminating Tenant's right to possession.

18.6    Acceptance of Rent Without Waiving Rights.  Landlord may accept Tenant's payments without waiving any rights under this Lease, including rights under a previously served notice of default.  If Landlord accepts payments after serving a notice of default, Landlord may nevertheless commence and pursue an action to enforce rights and remedies under the previously served notice of default without giving Tenant any further notice or demand.

19.    **Default by Landlord; Limitation of Liability.**

19.1    Landlord shall not be in default hereunder unless Landlord fails to perform the obligations required of Landlord within a reasonable time, but in no event later than thirty (30) days after written notice by Tenant to Landlord in writing specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion.  Tenant waives any right to terminate this Lease and to vacate the Premises on Landlord's default under this Lease.  Subject to limitations imposed elsewhere in this Lease, Tenant's sole remedy on Landlord's default is an action for damages or injunctive or declaratory relief.  Tenant waives the benefits of Civil Code Sections 1941 and 1942.

19.2    If Landlord is in default hereunder and, as a consequence thereof, Tenant recovers a judgment against Landlord, such judgment may be satisfied only out of the right, title and interest of Landlord in the Project and out of the rent or other revenue receivable by Landlord from the Project, or out of the proceeds receivable by Landlord from the sale or other disposition of all or any portion of Landlord's right, title and interest in the Project. Neither Landlord nor any of the partners, members, managers, property managers of Landlord shall be personally liable for any deficiency or otherwise.

20.    **Damage and Destruction**.

20.1    **Repair of Damage by Landlord.**  Tenant agrees to notify Landlord in writing promptly of any damage to the Premises resulting from fire, earthquake, or any other identifiable event of a sudden, unexpected, or unusual nature ("**Casualty**").  If the Premises are damaged by a Casualty or any common areas of the Building providing access to the Premises are damaged to the extent that Tenant does not have reasonable access to the Premises and if neither Landlord nor Tenant has elected to terminate this Lease under Section 20.3 or 20.4, Landlord shall promptly and diligently restore such common areas, the Building, and the Premises as originally constructed by Landlord and delivered to Tenant (excluding Tenant's Tenant Improvements, trade fixtures, furniture, equipment, or other personal property, or any other improvements made by Tenant, which shall be repaired, restored or replaced by Tenant at its expense) to substantially the same condition as existed before the Casualty, except for modifications required by building codes and other laws and except for any other modifications to the common areas considered desirable by Landlord. In making these modifications,



Landlord shall not materially impair Tenant's access to the Premises. Landlord's obligation to restore is subject to reasonable delays for insurance adjustment and other matters beyond Landlord's reasonable control and subject to the other clauses of this Section 20.

20.2 **Repair Period Notice.** Landlord shall, within the later of (a) ninety (90) days after the date on which Landlord determines the full extent of the damage caused by the Casualty or (b) thirty (30) days after Landlord has determined the extent of the insurance proceeds available to effectuate repairs, provide written notice to Tenant indicating the anticipated period for repairing the Casualty ("**Repair Period Notice**"). The Repair Period Notice shall also state, if applicable, Landlord's election either to repair or to terminate the Lease under Section 20.3.

20.3 **Landlord's Option to Terminate or Repair.** Landlord may elect either to terminate this Lease or to effectuate repairs if: (a) The Repair Period Notice estimates that the period for repairing the Casualty exceeds two–hundred and seventy (270) days from the date of the commencement of the repair; (b) The estimated repair cost exceeds the insurance proceeds, if any, available for such repair (not including the deductible, if any, on Landlord's property insurance), plus any amount that Tenant is obligated or elects to pay for such repair; (c) The estimated repair cost of the Premises or the Building, even though covered by insurance, exceeds thirty percent (30%) of the full replacement cost of the Premises or Building, whichever is applicable; or (d) The Building cannot be restored except in a substantially different structural or architectural form than existed before the Casualty. Landlord's election shall be stated in the Repair Period Notice.

20.4 **Tenant's Option To Terminate.** If the Repair Period Notice provided by Landlord indicates that the anticipated period for repairing the Casualty exceeds two–hundred and seventy (270) days, Tenant may elect to terminate this Lease by providing written notice ("**Tenant's Termination Notice**") to Landlord within ten (10) days after receiving the Repair Period Notice. If Tenant does not elect to terminate within this ten–day (10–day) period, Tenant shall be considered to have waived the option to terminate.

20.5 **Rent Abatement Due to Casualty.** Landlord and Tenant agree that, if the Casualty was not the result of the negligence or willful misconduct of Tenant or Tenant's employees, contractors, licensees, or invitees, Tenant shall be provided with a proportionate abatement of Base Rent, Operating Costs and Tax Costs based on the rentable square footage of the Premises rendered unusable (due to physical damage to the Premises or the unavailability of access to the Premises) and not used by Tenant, but only to the extent that Landlord is reimbursed from the proceeds of rental interruption insurance purchased by Landlord the cost of which is an Operating Costs. The proportional abatement, if any, shall be provided during the period beginning on the later of (a) the date of the Casualty or (b) the date on which Tenant ceases to occupy the Premises and ending on the date of substantial completion of Landlord's restoration obligations as provided in this Section 20. Subject to Section 20.4, the rent abatement provided in this Section 20.5 is Tenant's sole remedy due to the occurrence of the Casualty. Landlord shall not be liable to Tenant or any other person or entity for any direct, indirect, or consequential damage (including but not limited to lost profits of Tenant or loss of or interference with Tenant's business), whether or not caused by the negligence of Landlord or Landlord's employees, contractors, licensees, or invitees, due to, arising out of, or as a result of the Casualty (including but not limited to the termination of the Lease in connection with the Casualty). Tenant agrees to maintain business interruption insurance in amounts it deems necessary, in its discretion, to protect itself from damages and



losses related to a Casualty or other damage to the Project.

20.6 **Damage Near End of Term.** Despite any other provision of this Section 20, if the Premises or the Building is destroyed or damaged by a Casualty during the last twelve (12) months of the Lease Term, Landlord shall have the option to terminate this Lease by giving written notice to Tenant of the exercise of that option within thirty (30) days after that damage or destruction.

20.7 **Effective Date of Termination; Rent Apportionment.** If Landlord or Tenant elects to terminate this Lease under this Section 20 in connection with a Casualty, this termination shall be effective thirty (30) days after delivery of notice of such election. Tenant shall pay Rent, properly apportioned up to the date of the effective date of the termination of this Lease. After the effective date of the termination, Landlord and Tenant shall be discharged of all future obligations under this Lease, except for those provisions that, by their terms, survive the expiration or earlier termination of the Lease.

20.8 **Waiver of Statutory Provisions**. The provisions of this Lease, including those in this Section 20, constitute an express agreement between Landlord and Tenant that applies in the event of any Casualty to the Premises, Building, or Project. Tenant, therefore, fully waives the provisions of any statute or regulation, including California Civil Code sections 1932(2) and 1933(4), for any rights or obligations concerning a Casualty.

21.    **Eminent Domain.**

21.1   If the entire Premises, or enough thereof so as to render the balance thereof not reasonably usable for the conduct of Tenant's business, is taken or appropriated by a governmental agency under the power of eminent domain or conveyed in lieu thereof, either party hereto may terminate this Lease by serving written notice upon the other party hereto within thirty (30) days thereafter. If any substantial part of the Project excluding the Premises is taken or appropriated by a governmental agency under the power of eminent domain or conveyed in lieu thereof, Landlord may so terminate this Lease. In either event, Landlord shall receive (and Tenant shall assign to Landlord upon demand by Landlord) any income, Rent, award or any interest therein which may be paid in connection therewith, and Tenant shall have no claim for any part of any sum so paid, whether or not attributable to the value of the unexpired Lease Term; provided, however, that nothing herein shall prevent Tenant from pursuing a separate award in connection with the taking of Tenant's removable tangible personal property placed in the Premises solely at Tenant's expense, for Tenant's relocation costs and for loss of goodwill.

21.2   If a part of the Premises is so taken, appropriated or conveyed by a governmental agency, and neither party hereto elects to terminate this Lease, then Base Rent and Additional Rent payable hereunder shall be abated in the proportion that the portion of the Premises so taken, appropriated or conveyed bears to the area of the entire Premises.

21.3   Notwithstanding anything to the contrary contained in this Section 21, if the temporary use or occupancy of any part of the Premises (for a period not to exceed 60 days) is taken or appropriated by a governmental agency under the power of eminent domain or conveyed in lieu thereof during the Lease Term, this Lease shall be and remain unaffected by such taking, appropriation or conveyance and Tenant shall continue to pay in full all Rent payable by Tenant. In the event of any such temporary taking, appropriation or conveyance, Tenant shall be entitled to receive that portion of any award that represents compensation for loss of this use or occupancy of the Premises during the Lease Term, and Landlord shall be

entitled to receive the balance of such award. To the extent that it is inconsistent with the above, each party hereto hereby waives the provisions of Section 1265.130 of the California Code of Civil Procedure allowing either party to petition a court to terminate this Lease in the event of a partial taking of the Premises.

22.    **Sale by Landlord.** If Landlord sells or transfers all or any portion of the Project including the Premises, Landlord shall, upon consummation of the sale or transfer, be released from any liability relating to its obligations or covenants thereafter to be performed or observed under this Lease, and Tenant agrees to look solely to Landlord's successor-in-interest with respect to such liability. If Landlord transfers or credits any security deposit or prepaid Rent to Landlord's successor-in-interest, then upon such transfer Landlord shall be discharged from any further liability therefor.

23.    **Surrender of Premises.** Upon the expiration or sooner termination of the Lease, Tenant shall surrender to Landlord the Premises broom clean and free of debris, with all repairs, changes, alterations, additions and improvements thereto, in good order, condition and repair, ordinary wear and tear and damage from insured casualty excepted. At Tenant's sole cost and expense, Tenant shall upon expiration or sooner termination of the Lease: (a) remove its personal property from the Premises; (b) remove any improvements to the Premises installed by Tenant that Landlord may require Tenant to remove pursuant to Section 7.3; and (c) repair any damage caused by the removal of any such property or improvements. If Tenant leaves any personal property at the Premises, Landlord may remove such personal property and dispose of it at Tenant's expense. If Tenant does not reclaim such property within the period permitted by law, Landlord may sell such property in accordance with law and apply the proceeds of such sale to any sums due and owing hereunder, or retain said property, granting Tenant credit against sums due and owing hereunder for the reasonable value of such property.

24.    **Quiet Enjoyment.** So long as Tenant is not in default hereunder, Tenant shall have the right to the quiet peaceful enjoyment and possession of the Premises and the use of the Common Areas during the Lease Term, subject to the terms and conditions of this Lease. All provisions of this Lease to be performed by Tenant are both covenants and conditions.

25.    **Notices.** Any notice, demand or other communication to be given under the provisions of this Lease shall be in writing to the appropriate address set forth in Section 1.1.8 (or such address furnished by either party hereto to the other party hereto in writing) and shall be (a) personally served, (b) mailed by United States registered or certified mail, return receipt requested, postage prepaid, (c) sent by a nationally recognized courier service (e.g. Federal Express) for next day delivery, to be confirmed in writing by such courier or (d) sent by electronic facsimile with appropriate provisions for confirmation of receipt. Service by mail shall be deemed complete on the day of actual delivery as shown by the addressee's registered or certified mail receipt or at the expiration of the third business day after the date of mailing, whichever first occurs. Service by personal service or courier shall be deemed complete on receipt. Service by electronic facsimile shall be deemed complete on confirmation of receipt if received prior to the close of business, and on the next business day if received after the close of business.

26.    **Personal Property Taxes.** Tenant shall pay before delinquency all taxes, assessments, license fees and other charges (collectively, "**Tenant's Taxes**") that are levied and assessed against Tenant's trade fixtures and other personal property installed or located in or on the



Premises that become payable during the Lease Term.  On demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of such payments.  If any taxes on Tenant's personal property are levied against Landlord or Landlord's property, or if the assessed value of the Building is increased by the inclusion of a value placed on Tenant's personal property or above-standard leasehold improvements, Tenant, on demand, shall immediately reimburse Landlord for any such taxes.  Landlord shall have the right to pay these taxes regardless of the validity of the levy.  Notwithstanding the foregoing, Landlord agrees to: (a) notify Tenant in writing prior to paying any taxes under this Section 26 on Tenant's behalf ("**Landlord's Tax Notice**"), and (b) not pay any such taxes on Tenant's behalf if Tenant notifies Landlord in writing within five (5) business days after it receives Landlord's Tax Notice that Tenant, in good faith, disputes that the assessed taxes are properly due and owing by Tenant, provided that Tenant diligently pursues such dispute with the appropriate taxing authority in good faith within thirty (30) days from Landlord's Tax Notice.

27.    **Interest and Late Charges**.  Any Rent, Additional Rent or other amount not paid by Tenant to Landlord when due hereunder shall bear interest from the due date until paid, unless otherwise specifically provided herein, at a rate ("**Interest Rate**") equal to 30 days after the lesser of (a) ten percent (10%) per annum, or (b) the maximum rate permitted by law.  The payment of such interest shall not excuse or cure any such default by Tenant under this Lease.  In addition to such interest, if any Rent, Additional Rent or other amount is not paid within five (5) days of when due, a late charge equal to the greater of $50.00 or ten percent (10%) of such amount shall be assessed against Tenant, which late charge Tenant hereby agrees is a reasonable estimate of the damages Landlord would suffer as a result of Tenant's late payment.  The parties agree that it would be impracticable and extremely difficult to fix Landlord's actual damages in such event.  Such interest and late charges are separate and cumulative and are in addition to and shall not diminish or substitute for any or all of Landlord's rights or remedies under any other provision of this Lease.

28.    **Collection Agency and Attorneys' Fees**.  Tenant shall pay the costs incurred by Landlord if Landlord uses a collection agency or attorney to collect any monies unpaid by Tenant or to enforce the terms of this Lease.  In any action to enforce or interpret this Lease, including any suit by Landlord for the recovery of Rent or possession of the Premises, the non-prevailing party shall pay to the prevailing party its actual attorneys' fees.  The prevailing party will be determined by the court before which the action was brought based upon an assessment of which party's major arguments or positions could fairly be said to have prevailed.  Any attorneys' fees and other costs and expenses incurred by the prevailing party in enforcing a judgment under this Lease shall be recoverable separately from and in addition to any other amount included in such judgment in favor or the prevailing party.

29.    **Light and Air.**  Tenant covenants and agrees that no diminution of light, air or view by any structure that may hereafter be erected shall entitle Tenant to any reduction of Rent under this Lease, result in any liability of Landlord to Tenant, or in any other way affect this Lease or Tenant's obligations hereunder.

30.    **Signs and Directory.**

30.1    Without the prior written consent of Landlord, Tenant shall not place, construct or maintain any sign, advertisement, awning, banner or other decoration on or visible from, or otherwise use, the exterior of the Premises or any other portion of the Project.  All door signs on

the exterior of the Premises must be installed by Landlord, at Tenant's sole cost and expense, and must conform to standards of the Project as to size, style, placement, color and number of the names, and other matters as reasonably determined by Landlord. In the event that Tenant violates the foregoing, Landlord may remove the sign without any liability, and may charge Tenant the expense incurred, including but not limited to the cost incurred for the repair of the wall, door surface or other area on which the sign was mounted.

30.2    Landlord shall place, construct and maintain a directory in the Building lobby and in such other locations, if any, as Landlord, in its sole discretion, may determine, which directory(ies) shall be for the display of the business names of Building tenants and their respective suite numbers. Landlord shall have the sole right to determine and change from time to time the type of such directory(ies) and all common Project signage, including, but not limited to, size of letters, style, color content and placement. The directories of the Building will be provided for the display of the name and location of Tenant named on the Lease and Landlord reserves the right to exclude any other names therefrom. Tenant shall be entitled to initial listings on the directory for each Tenant indicated on the Lease. Additional listings thereafter, if approved in writing by Landlord, shall be at the sole cost and expense of the Tenant. All orders for directory listings should be given to Landlord in writing by Tenant. No verbal orders, changes, additions or deletions shall be accepted by Landlord.

31.    **Security Measures.** Tenant hereby acknowledges that the Rent payable to Landlord hereunder does not include the cost of guard service or other security measures, and that Landlord shall have no obligation whatsoever to provide same. Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents and invitees and their property from the acts of the third parties. While Landlord does not assume any responsibility to provide any security measures or any liability for failure to provide security measures or for any inadequacy thereof, Landlord shall have the authority to institute or continue such security measures as Landlord in its sole discretion deems necessary or appropriate from time to time, the cost and expenses of which shall be considered Operating Costs. To the degree directed by Landlord, Tenant shall coordinate its security measures at the Premises with the security measures instituted by Landlord, if any.

32.    **Inducement Recapture.**    Any agreement by Landlord to provide free or abated rent including abated or waived pass through expenses or other charges applicable to the Premises, or for the giving or paying by Landlord to or for Tenant of any cash or other bonus, inducement or consideration for Tenant's entering into this Lease, including the cost of landlord's initial tenant improvements and/or tenant improvement allowances, all of which concessions are hereinafter referred to as "**Inducement Provisions,**" shall be deemed conditioned upon Tenant's full and faithful performance of all of the terms, covenants and conditions of this Lease to be performed or observed by Tenant during the Term as the same may be extended. Upon the occurrence of a default of this Lease by Tenant, all such Inducement Provisions shall automatically be deemed deleted from this Lease and of no force or effect, and any un-amortized amount, based upon a straight line amortization, of any rent, pass through expense, other charge, bonus, inducement or consideration theretofore abated, given or paid by Landlord under any such Inducement Provision shall be immediately due and payable by Tenant to Landlord as Rent due under this Lease at the time such default is established and recoverable by Landlord, notwithstanding any subsequent cure of said breach by Tenant.

33.    **Confidentiality.** In consideration of Landlord's entry into this Lease, Tenant unconditionally agrees that, during the Term of this Lease, Tenant will not, except as required



by law or with the prior written consent of the Landlord, voluntarily disclose to any third party the terms and conditions of this Lease. This confidentiality agreement shall not preclude Tenant from disclosing its terms to Tenant's agents and employees, but such agents and employees shall be subject to the same limitations on confidentiality and Tenant shall remain responsible for any unauthorized disclosures by its agents and employees.

34.   **Authority.** If Tenant is a corporation, trust, limited liability company or partnership, each individual executing this Lease on behalf of Tenant represents and warrants that he or she is duly authorized to so execute and deliver this Lease. If Tenant or Guarantor is a corporation, it shall, upon demand, also deliver satisfactory evidence of (a) good standing in California, and in Tenant's or Guarantor's state of incorporation, (b) qualification to do business in California, and (c) a corporate resolution duly certified by the secretary of Tenant or Guarantor authorizing the execution and delivery of this Lease or Guarantee, as the case may be, by the parties who have signed it on behalf of Tenant or Guarantor.

35.   **Miscellaneous.**

35.1   If either Landlord or Tenant waives the performance of any term, covenant or condition contained in this Lease, such waiver shall not be deemed to waive any other breach of the same or of any other term, covenant or condition contained herein. Landlord's or Tenant's waiver of any term, covenant or condition of this Lease may only be made by a written document signed by the waiving party. Furthermore, the acceptance of Rent by Landlord shall not constitute a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such breach at the time of Landlord's acceptance of such Rent. Failure by Landlord to enforce any of the terms, covenants or conditions of this Lease for any length of time shall not be deemed to waive or to affect the right of Landlord to insist thereafter upon strict performance by Tenant.

35.2   Unless specifically stated otherwise in writing by Landlord, the voluntary or other surrender of this Lease by Tenant, the mutual termination or cancellation hereof, or a termination hereof by Landlord as a result of Tenant's default, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Landlord may elect to continue any one or all existing subtenancies. Landlord's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Landlord's election to have such event constitute the termination of such interest.

35.3   This Lease shall not be recorded; and no memorandum of lease shall be recorded without Landlord's prior written consent.

35.4   This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document. Both counterparts shall be construed together and shall constitute a single lease.

35.5   Nothing contained in this Lease shall be construed to create the relationship of principal and agent, partnership, joint venture or any other relationship between the parties hereto, other than the relationship of landlord and tenant.

35.6   Any provision of this Lease that proves to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and such other provisions shall remain in full force and effect.

35.7    The term "Premises" shall be deemed to include (unless, based on the context, such meaning would clearly be unintended) the space hereby demised and all improvements on or at any time hereafter constructed or built in such space. Tenant hereby acknowledges and agrees that the exterior walls of the Building and the area between the demising walls of premises and the finished ceilings and floors of the Premises and the slab of the floor above or below have not been demised hereby and that the use thereof, together with the right to install, maintain, use, repair and replace pipes, ducts, conduits and wires leading through, under, above or alongside the Premises, is hereby reserved unto Landlord.

35.8    The term "Tenant" or any pronoun used in place thereof shall indicate and include the masculine or feminine, the singular or plural number, individual, firms or corporations, and any Tenant's successor in interest.

35.9    The section headings herein are for convenience of reference only and shall in no way define, increase, limit or describe the scope or intent of any provision of this Lease.

35.10   If this Lease is entered into by co-tenants, the obligations of such co-tenants hereunder shall be joint and several.

35.11   Time is of the essence of this Lease and all of its provisions.

35.12   The laws of California shall in all respects govern this Lease. The parties acknowledge that the laws of California may change by virtue of legislative enactment or judicial decision. The parties further acknowledge that they have entered into this Lease based on the laws of California at the time of the execution of this Lease, and each hereby expressly waives any future rights, benefits, or advantages derived from or as a result of any future changes in the law of California to the extent not inconsistent with the terms of the Lease. In any action or proceeding arising therefrom, Tenant hereby consents to (a) the jurisdiction of any competent court within the state of California and within the county in which the Project is located, (b) service of process by any means authorized by the laws of the state of California, and (c) trial without a jury except for actions primarily based upon personal injury.

35.13   This Lease contains the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes any previous negotiations, and may not be modified, except by a written document executed by the parties hereto. There have been no representations or understandings made between the parties other than those set forth in this Lease. Without limiting the generality of the foregoing, Tenant specifically acknowledges and agrees that neither Landlord nor any broker, agent or representative thereof has made any warranty or representation with respect to the tenant mix of the Building, the identity of prospective tenants or other tenants of the Building, profitability or suitability of the Premises for Tenant's use, the state of repair of the Project and the Premises, or the amount and extent of provided services, except as otherwise specifically set forth herein.

35.14   If more than one person, is named as Tenant in this Lease and executes the same as such, then and in such event, the word "Tenant" wherever used in this Lease is intended to refer to all such persons, and the liability of such persons, for compliance with and performance of all the terms, covenants and provisions of this lease shall be joint and several. If Tenant is composed in whole or in part of a husband and wife, the separate property and estate of each spouse as well as the total of their combined property and estates (regardless of however such property or estates may be designated, whether community, martial or otherwise) to which either may have any claim or interest whatsoever based upon their marital status shall be liable hereunder.

29



35.15  The words "person" and "persons" as used herein shall include individuals, firms, partnerships, associations and corporations.

35.16  The language in all parts of this Lease shall be construed simply according to its fair meaning, and not strictly for or against Landlord or Tenant.  Any reference to any Section herein shall be deemed to include all subsections thereof unless otherwise specified or reasonably required from the context.  Any reference to "days" or "months" herein shall refer to calendar days or months, respectively, unless specifically provided to the contrary.  Unless clearly inconsistent with the context, any reference herein to the "term hereof" or "the Lease Term" shall refer to the term of this Lease as the same may be extended pursuant to any extension option(s) contained herein.  The terms "herein", "hereunder" and "hereof" as used in this Lease shall mean "in this Lease" and "under this Lease" or "of this Lease" respectively, except as otherwise specifically set forth in this Lease.

35.17  All exhibits and the addendum referred to in this Lease are incorporated herein as a part hereof.

35.18  The submittal of this Lease by Landlord or its agent or representative for examination or execution by Tenant does not constitute an option or offer to lease the Premises upon the terms and conditions contained herein or a reservation of the Premises in favor of Tenant.  This Lease shall become effective only upon the execution hereof by Landlord and Tenant and delivery of a fully executed counterpart hereof to Tenant.

35.19  At any time this Lease provides that Landlord is entitled to collect or receive attorneys' fees from Tenant, this shall include the right of Landlord to collect reasonable, market-rate attorneys' fees for the time spent by Landlord's or Landlord's property manager's in-house legal counsel.

35.20  Tenant warrants and represents that neither its execution of this Lease nor its performance hereunder will violate any agreement, instrument, contract, law, rule or regulation by which Tenant is bound.  Tenant shall indemnify Landlord against any loss, cost, damage or liability including, without limitation, reasonable attorneys' fees and related costs arising out of Tenant's breach of this warranty and representation.

35.21  If any lender of Landlord or ground lessor of the Project requires a modification of this Lease that will not increase Tenant's cost or expense or materially or adversely change Tenant's rights and obligations, this Lease shall be so modified and Tenant shall execute whatever documents are required and deliver them to Landlord within ten (10) days after the request.

35.22  Without regard to any references to the terms "sole" or "absolute", except for matters which could adversely affect the Building's plumbing, HVAC or electrical systems, or its exterior appearance (in which case Landlord shall have the right to act in its sole and absolute discretion), any time the consent of Landlord or Tenant is required, such consent shall not be unreasonably withheld or delayed.  Whenever the Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make allocations or other determinations, Landlord and Tenant shall act reasonably and in good faith and take no action which might result in the frustration of the reasonable expectations of a sophisticated tenant or landlord concerning the Lease.

36.    **Rules and Regulations**.  Tenant shall observe and comply with the rules and regulations set forth in this Section 36 ("**Rules and Regulations**") and any and all reasonable

modifications thereof and additions thereto established in writing by Landlord. Landlord shall not be responsible for the non-observance of, or noncompliance with, any Rules and Regulations by any other tenant or occupant of the Building or Project. Landlord may waive any or more of these Rules and Regulations for the benefit of Tenant or any other Tenant, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of Tenant or any other Tenant, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all of the Tenants of the Building. In the event of any conflict between the Rules and Regulations and other provisions of this Lease, the other provisions of the Lease shall control.

36.1    Tenant shall not obstruct, encumber or use any sidewalks, entrance, passages, courts, elevators, vestibules, stairways, corridors or halls or Common Area for any purpose other than ingress and egress to and from the Premises or the Building.

36.2    All electrical fixtures hung in offices or spaces along the window perimeter of the Premises must be of a quality, type, design, bulb color, size and general appearance approved by Landlord and must be installed by Landlord at Tenant's cost.

36.3    Tenant shall not cover or obstruct the sashes, sash doors, skylights, windows, and doors that admit light or air into the interior Common Areas, nor shall any articles be placed on the windowsills of the Project.

36.4    No articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in public portions thereof without the prior written consent of Landlord.

36.5    The water and janitorial closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags or other substances shall be thrown therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant to the extent caused by Tenant or Tenant's agents, servants, employees, contractors, visitors or licensees.

36.6    Tenant shall not mark, paint, drill into or in any way deface any part of the Premises or the Project, or string any wires except with the prior written consent of Landlord and as Landlord may direct. Notwithstanding the foregoing, Landlord hereby consents to the hanging of normal office decorations.

36.7    No animal (except for seeing-eye dogs or other ADA-approved animals), bird of any kind, or bicycles shall be brought into or kept in or about the Premises or the Building.

36.8    Prior to leaving the Premises for the day, Tenant shall endeavor to draw or lower window coverings and extinguish all lights.

36.9    Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of or visitors to the Building or neighboring buildings. Tenant shall not throw anything out of the doors, windows or skylights or down the passageways. Tenant shall at all times keep the doors closed from Tenant's suite into the Common Areas of the Project except upon prior written approval of Landlord.

36.10    Neither Tenant nor any of Tenant's agents, servants, employees, contractors, visitors or licensees shall at any time bring or keep upon the Premises any inflammable, combustible or explosive fluid, chemical or substance except in such small quantities and in original manufacturer's containers as may reasonably be required for the proper operation and maintenance of Tenant's office equipment.

36.11    Landlord shall deliver keys to Tenant upon Tenant's occupancy. Tenant shall not

place any additional locks, bolts or mail slots of any kind upon any of the doors or windows, nor shall Tenant change any existing locks or the mechanism thereof without Landlord's prior written consent. Upon the termination of the tenancy, Tenant must turn over to Landlord all keys for the Premises or the Project and, in the event of the loss of any keys so furnished, Tenant shall pay to Landlord the cost thereof.

36.12 Delivery or removal of any safes, freight, furniture, fixtures, bulky matter or heavy equipment of any description must take place during the hours which Landlord or its agent may reasonably determine from time to time, upon previous notice to the Landlord and in a manner and at times reasonably prescribed by Landlord, and the persons employed by Tenant for such work are subject to Landlord's reasonable prior approval. Landlord reserves the right to prescribe the weight and position of all safes, or other extra heavy equipment or furniture or improvements so as to distribute the weight or to require reinforcing at the cost of Tenant. Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations of this Lease, normal office equipment excluded.

36.13 Tenant shall not purchase janitorial or maintenance or other like service from any company or persons not approved by Landlord, except that Landlord's approval shall not be required in connection with any maintenance or other like service that does not affect the structure or other major systems of the Building. Landlord shall approve a sufficient number of sources of such services to provide Tenant with a reasonable selection, but only in such instances and to such extent as Landlord in its judgment considers consistent with security and proper operation of the Building.

36.14 All office or medical equipment of any electrical or mechanical nature shall be placed by Tenant in the Premises in settings or housings approved by Landlord, to absorb or prevent any vibration, noise or annoyance.

36.15 Landlord reserves the right to exclude from the Building all persons who are not otherwise authorized by Tenant to enter the Premises.

36.16 Tenant's interior designers and installers of Tenant's decoration, furniture, carpentry, wall coverings, and window coverings, shall, while in the Building or elsewhere in the Project, be subject to and under the control and direction of the Building manager (but not as agent or servant of said manager or of Landlord).

36.17 If the Premises is or becomes infested with vermin as a result of the use or any misuse or neglect by Tenant, its agents, servants, employees, contractors, visitors or licensees, then Landlord shall forthwith at Tenant's expense cause the same to be exterminated by licensed exterminators to the satisfaction of Landlord and, as necessary, from time to time thereafter.

36.18 Requests by Tenant for services must be made at and as instructed by the office of the Building.

36.19 Canvassing, soliciting and peddling in the Building are prohibited and Tenant shall cooperate to prevent the same.

36.20 No air conditioning unit(s) shall be installed or used by Tenant without Landlord's written consent.

36.21 No hand trucks or dollies, except those equipped with rubber tires and side guards, may be used in any space in the Project, either by Tenant or by jobbers or others. Tenant shall not permit its customers, clients or invitees to wait in the public corridors of the



Building.  Tenant shall not permit its employees to loiter or smoke in the interior Common Areas.

36.22  Tenant, Tenant's agents, servants, employees, contractors, licensees or visitors (i) shall not park or stop any vehicles in any driveways, service entrances, or areas posted for parking by visitors or posted as "No Parking" or "No Stopping" areas, and (ii) shall not leave vehicles in the Project overnight or park any vehicles in the Project other than automobiles, motorcycles, motor driven or non-motor driven bicycles or four-wheeled trucks.  Landlord may, in its sole discretion, designate separate areas for the parking of vehicles by Tenant, Tenant's agents, servants, employees, contractors, licensees or visitors.

36.23  Tenant shall not use the name of the Building for any purpose other than as the address of the Tenant's business in the Premises, nor shall Tenant use any picture of the Building in its advertising, stationery or in any other manner without the prior written permission of Landlord.  Landlord expressly reserves the right at any time to change name of the Building or Project without in any manner being liable to Tenant therefor.

36.24  No smoking is allowed in the Building.

37. **Parking.**  As long as Tenant is not in default hereunder, subject to the rules and regulations established by Landlord from time to time, during the Term of the Lease, Tenant shall be allocated **Four (4)** unreserved monthly parking spaces for use by Tenant and/or Tenant's staff.  Parking shall be at Landlord's prevailing monthly parking rate which is currently $80.00 per parking space.  Validation stickers may be purchased at Landlord's prevailing rate.  Tenant agrees, if requested by Landlord, to use Landlord's no additional charge valet service in lieu of self-parking for parking by Tenant's doctors and/or Tenant's staff.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first set forth above.

"Landlord"

**West Valley Medical Partners, LLC**

By: _____
     Gary Grabel, Manager

"Tenant"

_____
Stanley Menaker

_____
Marina Menaker

_____
Lucy Oks

33

EXHIBIT A

FLOOR PLAN OF THE PREMISES



B-1

EXHIBIT "B"

**First Amendment to Lease**

This First Amendment to Office Lease ("First Amendment") is made as of April 1, 2010 by and between **West Valley Medical Partners, LLC** ("Landlord") and **Stanley Menaker, an individual and Marina Menaker, and individual, husband and wife and Lucy Oks, an individually, jointly and severally** ("Tenant") with reference to the following recitals.

    A.    Landlord and Tenant are parties to that certain Office Lease dated October 22, 2009 (the "Lease"), pursuant to which Tenant leases from Landlord office space known as Suite 121 (the "Premises") in the West Valley Medical Center located at 5363 Balboa Blvd., Encino, California 91316 (the "Building").

    B.    Tenant desires to amend the Lease.

Now, Therefore in consideration of the foregoing recitals, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree to amend the Lease upon the following terms and conditions:

    1.    <u>Definitions</u>. All terms not otherwise defined herein shall have the meaning set forth in the Lease, unless the context clearly indicates otherwise. From and after the date hereof, reference to the Lease shall mean the Lease as amended hereby. In the event of any inconsistency between the terms of the Lease and the terms of the First Amendment, the terms of this First Amendment shall control.

    2.    <u>Base Rent Deferral.</u> Landlord agrees to defer one half (1/2) of the Base Rent (i.e. $3,850 per month) for the months of April 2010, May 2010, June 2010, July 2010, and August 2010 ("Deferred Base Rent"). The Deferred Base Rent shall be paid in monthly increments of $3,850 commencing April 2012 and continue through August 2012. Hence, in April 2012 Tenant shall play, in addition to Rent otherwise due, an additional $3,850. Similarly, in May 2012 Tenant shall pay, in addition to Rent otherwise due, an additional $3,850 and so on monthly through August 2012. Landlord shall have the same rights with respect to non-payment of Deferred Base Rent hereunder as it has with respect to non-payment of Rent due under the Lease.

    3.    <u>Ratification and effectiveness.</u> This Lease, as amended by this First Amendment, shall remain in full force and effect upon all of the terms and conditions set forth therein and herein. Tenant hereby ratifies and confirms the effectiveness of the Lease as amended hereby as the entire agreement between the parties with respect to Tenant's occupancy of the Building. Tenant acknowledges that

Landlord is not in default under the Lease and no event has occurred which with the giving of notice or the passing of time would constitute a default by Landlord under the Lease. This First Amendment shall be effective as of the date hereof upon execution and delivery by Landlord and Tenant. Except for those provisions and exhibits expressly amended hereby, the Lease remains unmodified.

4.  Authorization. Each entity executing this First Amendment hereby represents and warrants that it has the capacity set forth on the signature pages hereof with full power and authority to bind the party on whose behalf it is executing this First Amendment to the terms hereof.

In witness whereof, Landlord and Tenant have caused their duly authorized representative to execute this First Amendment as of the date first above written.

Landlord:             West Valley Medical Partners, LLC

                      By: _____

                      Its: Authorized Officer

Tenant:               _____
                      Stanley Menaker

                      _____
                      Marina Menaker

                      _____
                      Lucy Oks

| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Ian S. Landsberg (SBN: 137431)<br>Landsberg Law, APC<br>9300 Wilshire Blvd., Suite 565<br>Beverly Hills, CA 90212<br>Telephone: (310) 409-2228<br>Facsimile:  (310) 409-2380<br><br><br><br>*Attorney for Plaintiff* | |

## UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br>Stanley Menaker an individual, and Marina Menaker, an individual,<br><br><br><br><br>Debtor(s). | CASE NO.: 1:13-bk-13562-MB<br><br>CHAPTER: 13<br><br>ADVERSARY NO.: |
| West Valley Medical Partners, LLC, a California limited liability company,<br><br><br><br><br><br>Plaintiff(s)<br>Versus<br>Stanley Menaker an individual; Marina Menaker, an individual; and Does 1 through 10, inclusive,<br><br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** _____ | **Address:**<br>☐ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.** All parties must read and comply with the rule, even if you are representing yourself. You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference. A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH). If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference. **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

KATHLEEN J. CAMPBELL
CLERK OF COURT

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
            Deputy Clerk

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
9300 Wilshire Blvd., Suite 565, Beverly Hills, CA 90212

A true and correct copy (1) of the foregoing document entitled: **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING [LBR 7004-1]** and (2) the accompanying pleading(s) entitled:
Cpmplaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. SECTION 523(a)(3)

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
_05/05/2017_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
Mark D Estle, mdestle@estlelaw.com; Johnathan J Kirby, Johnathan.Kirby@JeffersonCapitalInternational.com
Leslie M Klott,  bankruptcy@zievelaw.com; Elizabeth (SV) F Rojas (TR), cacb_ecf_sv@ch13wla.com
Elena Steers , elena@steerslawfirm.com; julie@steerslawfirm.com;steers@ecf.inforuptcy.com; liz@steerslawfirm.com;
w.j.ogsaen@gmail.com; United States Trustee (SV) ,ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _05/05/2017_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _05/05/2017_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
 Honorable Martin R. Barash
United States Bankruptcy Court
Central District of California
21041 Burbank Boulevard, Suite 342 / Courtroom 303

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 05/05/2017 | Yesennia Alarcon | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

## SERVICE LIST

United States Trustee
915 Wilshire Blvd.
Suite 1850
Los Angeles, CA 90017

Stanley Menaker
5400 Lindley Ave.
Apt. 301
Encino, CA 91316

Marina Menaker
6616 Julie Lane
West Hills, CA 91307

Elena Steers
16633 Ventura Blvd.
Suite 900
Encino, CA 91436

Elizabeth F. Rojas
Valley Executive Center
5260 Ventura Blvd.
Suite 710
Sherman Oaks, CA 91403